**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| JONATHAN SANTIAGO, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 13-12172-IT |
| THOMAS LAFFERTY, *et al.*, | ) | |
| Defendants. | ) | |
| NEL SOTHY, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 13-12302-IT |
| THOMAS LAFFERTY, *et al.*, | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF LOWELL'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendant City of Lowell (hereinafter, "City") submits this memorandum of law in support of its motion for summary judgment.

In November 2012, the Lowell Police Department ("LPD") received a telephone call from the Massachusetts State Police ("MSP"). MSP had received information which raised the possibility that two confidential informants used by LPD's drug crimes unit, the Special Investigations Section ("SIS"), had planted evidence on individuals and then "informed" on them. This was the first time LPD had heard anything to suggest that its CIs might have planted evidence. Although it was not clear—and it remains to this day far from clear—that MSP's source was accurate, LPD took the allegations seriously and proceeded immediately to take action. Together the City and the Middlesex District Attorney's office arranged for all criminal cases affected in any way by the two CIs to be dismissed. The matter was thoroughly investigated by the Essex County District Attorney's office for several months, and it found no wrongdoing on the part LPD, or Lafferty.

The two Plaintiffs, Jonathan Santiago ("Santiago") and Nel Sothy ("Sothy"), were among those whose cases were dismissed in early 2013, and they have now brought lawsuits against the City and the detective who arrested them, Defendant Lafferty ("Lafferty"), alleging civil rights violations. It is important to be clear about what exactly Plaintiffs' allegations are. Their complaint is not that drugs were planted on them by the City's informants. That would not be a constitutional violation since neither of the informants, known in this litigation as FA nor FB, is a state actor. Nor is their complaint merely that they were arrested for possessing drugs that were planted—if Lafferty had no reason to know that the drugs were not theirs there would be no constitutional violation. Plaintiffs' claim is, specifically, that they were arrested by an officer who either participated in planting evidence himself, or who knew or should have known that evidence had been planted. Further, Plaintiffs maintain that the City deliberately and purposefully caused Lafferty's purported infractions. This is a tough row to hoe. Not only does all credible evidence point to the fact that Lafferty

1

arrested the Plaintiffs in good faith for probable cause, but no reasonable jury could conclude that the City demonstrated <u>deliberate indifference</u>—which is what Plaintiffs must show—towards the constitutional rights of its citizens with respect to the use of CIs. For these reasons, summary judgment must enter for the City.

## FACTUAL BACKGROUND

The City incorporates by reference its Statement of Undisputed Material Facts ("SUF"), filed herewith in support of its Motion for Summary Judgment.

## ARGUMENT

### I.   Summary Judgment Standard

Summary judgment should enter against a party who, "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When considering a motion for summary judgment, the court must draw inferences from underlying facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-588 (1986). That party, however, may not rely on "merely colorable" evidence, conclusory allegations, or unsupported speculation to ward off summary judgment. *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir. 1993). Rather, the party opposing summary judgment must offer "definite, competent evidence" to defeat it. *Id.* Further, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could <u>reasonably</u> find for the plaintiff." *Hoeppner v. Crotched Mountain Rehab. Ctr.*, 31 F.3d 9, 16 (1st Cir. 1994) (citation omitted, emphasis added).

### II.   Legal Standard for Municipal Liability under Monell

Municipal liability under *Monell v. Dept. of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978) is imposed only for constitutional violations that are caused by official municipal policy or custom. *See,*

*e.g.*, *Kennedy v. Town of Billerica*, 617 F.3d 520, 531-32 (1st Cir. 2010). A municipality may not be held liable under a theory of respondeat superior for an employee's constitutional violation. Instead, a plaintiff who brings a section 1983 action against a municipality bears the burden of showing that, "through its <u>deliberate</u> conduct, the municipality was the 'moving force' behind the injury alleged." *Haley v. City of Bos.*, 657 F.3d 39, 51 (1st Cir. 2011), citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997) and *Monell*, 436 U.S. at 694 (emphasis in original). For the City to be liable in these matters, therefore, Plaintiffs must show that the City <u>deliberately chose</u> a policy or custom that <u>caused</u> Lafferty to arrest Plaintiffs for drug trafficking despite the fact that he knew or should have known that they were innocent. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989) ("Municipal liability under § 1983 attaches where—<u>and only where</u>—a deliberate choice to follow a course of action is made from among various alternatives by city policymakers.") (citation omitted, emphasis added). Such deliberate choice can potentially be demonstrated in the following ways:

1. The municipal actor who engaged in the alleged constitutional rights violation did so pursuant to actual municipal policy.

2. A municipal actor with final policymaking authority directly caused or authorized the alleged constitutional injury.

3. The City had an unconstitutional custom sufficiently "well-settled" as to demonstrate actual or constructive knowledge of it on the part of municipal policymakers, which custom either was the constitutional violation or directly caused it.

4. The City engaged in municipal <u>inaction</u> of some variety (a failure to train, to supervise, or to correct a deficient culture), which caused the alleged constitutional violation and from which deliberate indifference to the rights of citizens may be inferred. Deliberate indifference may be inferred from:

   a. a series or pattern of constitutional violations of the same type as those of which Plaintiffs complain, and of which policymakers were or should have been aware; or

   b. demonstration that Plaintiffs' alleged constitutional violation was the "patently obvious" result of the purported municipal oversight.

Below, the City will examine each of the above in turn and show that the evidence in this matter precludes a reasonable jury from finding in favor of the Plaintiffs under <u>any</u> standard. As a precursor

3

even to consideration of the Monell tests set forth above, however, Plaintiffs must first demonstrate that a triable issue exists as to whether or not they suffered a constitutional violation. The City contends that Santiago cannot do this.

### III.   It Is Beyond Dispute that Santiago Did Not Suffer a Constitutional Violation

Santiago claims that he was arrested "without probable cause based on evidence [Lafferty] knew or should have known was placed in Mr. Santiago's car without his knowledge." Sant. Cmplt. ¶ 49. But probable cause existed for Santiago's arrest. The following cannot reasonably be disputed:

- On February 21, 2012, Lafferty was on duty and stationed at or around Gorham Street at the intersection with Union Street. That intersection is near Jay's Food Store. SUF ¶ 14.

- Santiago was also in the area on February 21, 2012. He spent several hours at an apartment on Gorham Street and drove either to or from that apartment at least four times. *Id.* ¶¶ 19, 21.

- First, Santiago drove <u>to</u> his friend Crystal's house on Gorham Street at around 6:30 or 7 p.m. Then, at approximately 8 or 8:30, Santiago <u>left</u> Crystal's house to drive another friend who was with them, Luis, home to Temple Street. Within 15 or 20 minutes Santiago <u>returned</u> to Crystal's house on Gorham Street. *Id.* ¶ 19.

- Santiago therefore drove up and down Gorham Street twice in relatively quick succession at around 8 or 8:30 p.m. on the night of his arrest. Part of Union St. lies between Gorham St. and Temple St. *Id.* ¶¶ 19, 20.

- In his police report, Lafferty stated that, while monitoring the area, he had observed car license number 641NR4 "drive up Gorham St and down Union St." 641NR4 is the license of Santiago's car. Lafferty later testified that he had observed Santiago come "by my vantage point [around Jay's Food Store] twice." Lafferty remained stationary and did not follow or call surveillance on Santiago at that time. *Id.* ¶¶ 15, 18.

- That same evening, Lafferty received a telephone call from confidential informant FA in which, at a minimum, FA identified Santiago's car and told Lafferty that Santiago had drugs in the car. FA also told Lafferty that Santiago was driving near Jay's food store. *Id.* ¶ 16.

- Lafferty testified that FA's call came <u>after</u> he had observed Santiago come "by my vantage point twice." *Id.* ¶ 18.

- Lafferty testified that following the call from FA, he looked for Santiago's car and found it driving on Central Street. He then radioed his colleagues to surveil the car. *Id.* ¶ 22.

- Santiago testified that he left Crystal's <u>again</u> approximately an hour after he had arrived there for the second time, this time to follow FA to a bar. This was the <u>fourth</u> time Santiago had driven to or from Crystal's house that evening. It was the <u>third</u> such drive he had made within approximately an hour and a quarter. *Id.* ¶ 21.

- Santiago described the route he took following FA. There were several street names he could not recall. He stated that he drove up a street containing: a liquor store on the left, then a family dollar on the right, then a Dunkin Donuts on the right and a Chinese food store almost directly opposite on the left. *Id.* ¶ 23.

- The only street in the downtown Lowell area in which all of the above four landmarks occur in the succession described by Santiago is Central Street. Santiago therefore testified that he drove down Central Street. *Id.* ¶ 24.

- Santiago further described the route he took between Gorham Street and Westford Street, where he was pulled over and later arrested. He changed his testimony and appeared confused about the details of some of the directions he took, but he described the route as including multiple turns. *Id.* ¶¶ 23, 25. Because Central Street is east of Gorham Street, Santiago's depiction of it as "left" of Gorham Street must be mistaken in some respects. *Id.* ¶ 27.

- In his police report, Lafferty stated that Santiago made "repeated loops" while he was under surveillance. Santiago denies that he "circled" any streets during his drive to Westford Street. *Id.* ¶ 26.

- Rivera was also working that evening. He observed Santiago's car on Westford Street. Rivera stated that he observed the vehicle swerve across the yellow line, a traffic violation, and that based on the traffic violation he pulled over the car. Santiago denies that he swerved across the yellow line. *Id.* ¶¶ 12, 28, 29.

- There was an open beer can or bottle in Santiago's car. The beer can or bottle was taken out and placed on the roof of the car. *Id.* ¶ 31.

- After Santiago's car was stopped by Rivera, Lavoie arrived on the scene and at some point shortly following, Lafferty and Desmarais also arrived. *Id.* ¶ 30.

- There were at least two scented air fresheners in Santiago's car. Air fresheners can be used to mask the scent of narcotics. *Id.* ¶¶ 32, 33.

- Rivera checked Santiago's driving license and asked him to get out of the car. *Id.* ¶ 34.

- Santiago gave permission for his car to be searched. *Id.* ¶35. A canine unit was called in to assist with the search and the police canine, Axel, went to the gas cap of the car and scratched at it. *Id.* ¶¶ 36, 37.

- After Axel pawed at the gas cap, a detective opened the gas cap by lifting a lever inside the vehicle. Inside the gas cap was a white sock containing a clear plastic bag, which appeared to contain cocaine. Santiago was then placed under arrest. *Id.* ¶¶ 38, 39.

- Lavoie later field tested the white powder found inside the plastic bag and it tested positive for the presence of cocaine, a controlled class B substance. *Id.* ¶ 40.

Critically, Santiago gave permission for his car to be searched and drugs were found in his car. These facts alone provide probable cause to arrest Santiago, <u>even assuming</u> the truth of Santiago's claim that the drugs did not belong to him and that he knew nothing about them. *See e.g., Evans v. Gasca,* 2016 U.S. Dist. LEXIS 48496, at *12-13 (N.D. Ill. Apr. 11, 2016) ("The court evaluates probable cause not on the facts as an omniscient observer would perceive them, but rather as they would have appeared to a reasonable person in the position of the arresting officer. . . [p]robable cause does not require certainty.")

Certain matters related to the Santiago arrest are disputed, but none is material to whether there was probable cause for his arrest. First, Santiago disputes the motor vehicle infraction. But even assuming, in Santiago's favor, that there was no traffic violation and the vehicle stop was improper, it is beside the point. Probable cause for Santiago's arrest existed independently of the motor vehicle infraction. Santiago cannot claim, in a civil case, that the <u>results</u> of the motor vehicle stop, whether or not it was justified, should not be used against him. *See Townes v. City of N.Y.*, 176 F.3d 138, 145 (2d Cir. 1999) (fruit of the poisonous tree doctrine does not apply to section 1983 action and noting that Supreme Court has refused to extend the exclusionary rule to non-criminal contexts).[1] Second, the number of air fresheners in Santiago's car is disputed. This is also immaterial. Again, while the presence of air fresheners—two of which are admitted by Santiago— gave the narcotics detectives additional reason to suspect Santiago and to search his car, the fact that

---

[1] Further, it was <u>Rivera</u> who pulled Santiago over, not Lafferty. SUF ¶ 28; Ex. 3. No allegations of misconduct have been lodged at Rivera, and Lafferty cannot be faulted for a traffic stop he did not conduct and at which he was not present.

he gave permission to search renders the search permissible whether or not there were <u>any</u> air fresheners. Finally, Lafferty's police report indicates that he observed Santiago doing "repeated loops" around Gorham Street, whereas Santiago says that he did not circle.

Santiago has alleged that this so-called discrepancy was "fabricated" to given the impression that he "behaved like a drug dealer." Sant. Complt. ¶26. But there is <u>no genuine dispute</u>. Santiago was present at Gorham Street on the evening of February 21, 2012, and he made at least two trips from and back to Gorham Street, in quick succession around 8 or 8:30. This <u>corroborates</u> Lafferty's claim that Santiago passed his vantage point twice—and it was in fact by Santiago's own account a loop (just not a "drug prowling loop"); it was a loop between Gorham Street and Temple Street, ending back at Gorham. Santiago then left Gorham Street again and drove over to Central Street, where Lafferty saw his car again—he could reasonably conclude that Santiago must have driven between Gorham and Central. Santiago then proceeded on a circuitous route, on streets he could not name, to Westford Street. Even construing all inferences in the manner most favorable to the Plaintiff, a reasonable jury could <u>only</u> conclude from this that Lafferty's police report contains a technical inaccuracy, because it states that Santiago made "repeated loops" <u>after</u> he was being followed, rather than making it clear that certain of Santiago's drives occurred before that (when Lafferty was still stationary). In other words, Lafferty knew—and everything Santiago says is not only consistent with this but corroborates it—that Santiago had driven past the same high crime area of Gorham Street at least three times in relatively close temporal proximity.

Essentially, there is no genuine dispute about where Santiago <u>actually drove</u> on the evening of February 21, 2012. What remains is a quibble about Lafferty's description of "repeated loops" rather than using a more technically accurate description, such as "passed to and from Gorham Street three or four times and then headed on a circuitous route over to Central Street and back across town to Westford Street." The City submits that this does not present a genuine or material

dispute upon which summary judgment could be denied. *See Nakis v. Potter*, 422 F. Supp. 2d 398, 407 (S.D.N.Y. 2006) ("An alleged factual dispute regarding <u>immaterial or minor</u> facts between the parties will not defeat an otherwise properly supported motion for summary judgment."), citing *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) (emphasis added).

Because the facts of the Santiago case present no material dispute, and certainly none from which it could be inferred that Lafferty somehow knew or should have known that drugs had been planted on Santiago, judgment should enter as a matter of law for Lafferty and for the City.[2]

## IV.   Santiago and Sothy: No Policy or Custom Caused a Constitutional Violation

Even assuming *arguendo* that Santiago and/or Sothy can present a triable issue as to whether their arrests were unconstitutional, neither can show that the City caused this through its deliberate conduct. The City will now address in turn the methods set forth above (*infra* § II) through which a plaintiff may make the requisite showing for Monell liability to attach.

### a.   No Unconstitutional Policy

The first and most straightforward way of demonstrating Monell liability is for a plaintiff to show that the municipal actor who allegedly engaged in the constitutional rights violation did so pursuant to actual municipal policy, i.e., that the municipality operated under an official unconstitutional policy. *See Haley*, 657 F.3d at 51-52 ("[w]here a plaintiff claims that a particular municipal action <u>itself</u> violates federal law, or directs an employee to do so, resolving [the] issues of fault and causation is straightforward"), quoting *Monell*, 436 U.S. at 404 (emphasis in original). Plaintiffs cannot make such a showing here. There is no dispute that the Confidential Informant policy in place at the time of the Plaintiffs' arrests was adequate. SUF ¶ 65. Plaintiffs have

---

[2] As to Plaintiff Sothy, the City relies on arguments presented by Defendant Lafferty in his motion for summary judgment, in addition to the City's Monell arguments set forth below, which apply equally to Santiago and Sothy. In doing so, the City does not waive the right to raise further arguments concerning Sothy in its Reply brief.

not pled that the City adopted a policy that authorized officers to make false arrests, or indeed that it promulgated <u>any</u> unconstitutional policy.

### b. No Final Policymaker Authorization of Unconstitutional Acts

A second way in which a plaintiff may demonstrate the <u>deliberate</u> municipal conduct required for a Monell claim is to show that a person with final policymaking authority caused or authorized the alleged constitutional injury. *See,* e.g.*, Rodríguez-García v. Miranda-Marín*, 610 F.3d 756, 769-770 (1st Cir. 2010) (policy or custom may be established by showing that a person with final policy making authority caused the supposed constitutional injury). Most straightforwardly, if a policymaker himself or herself directly authorized the unconstitutional violation, then municipal liability may attach. *See id.* at 770. Whether or not somebody has final policymaking authority— ultimate responsibility for policies—is a matter of law. *See Putnam v. Town of Saugus*, 365 F. Supp. 2d 151, 183 (D. Mass. 2005) ("The existence of final policymaking authority is not matter of fact. Rather, it is matter of state and local law to be determined by the trial judge before a case is submitted to a jury.") In Lowell, the person with the ultimate responsibility for matters of police policy, including the handling of confidential informants, is the Superintendent of Police. City of Lowell Ordinance, Ch. 20 Art. VI, § 20-30 ("The Superintendent of Police shall have control of the Police Department of the City, its officers and members."); *see Ringuette v. City of Fall River*, 888 F. Supp. 258, 270 (D. Mass. 1995) ("municipality can be held liable if its police chief is a policymaker and acquiesces in a police custom or policy as to which he has actual or constructive knowledge"), quoting *Kinan v. Brockton*, 876 F.2d 1029, 1035 (1st Cir. 1989).

As a matter of law, Lafferty is not and has never been a policymaking official of the City. Also as a matter of law, the sergeants and lieutenants who supervise SIS are not final policymakers. *See*, *e.g.*, *Almonte v. Silva*, 2010 U.S. Dist. LEXIS 29862, at *62 (D.R.I. Mar. 3, 2010) ("neither a lieutenant nor a sergeant is a person with final policymaking authority"); *see also* SUF ¶¶ 3, 4.

Plaintiffs have never pled to the contrary. There is no evidence to indicate, and Plaintiffs have never

pled, that the Superintendent (or any policymaker) made a deliberate decision to authorize Lafferty's

purported constitutional violations. Thus Plaintiffs cannot establish Monell liability in this way.

    *c.*   ***No Unconstitutional Custom***

A plaintiff may alternatively demonstrate the requisite municipal deliberate conduct for

Monell liability by showing (1) a custom that is "so well settled and widespread that the

policymaking officials of the municipality can be said to have either actual or constructive

knowledge of it yet did nothing to end the practice," and (2) that such a custom caused—was the

moving force behind—the constitutional rights violation. *See Henriquez v. City of Lawrence*, 2015 U.S.

Dist. LEXIS 82612, *6 (D. Mass. June 25, 2015) (Talwani, J.), quoting *Bordanaro v. McLeod*, 871 F.2d

1151, 1156 (1st Cir. 1989). Custom, as opposed to policy, "consider[s] actions by officials below

those in overall command, and seek[s] to determine whether the pattern of these actions forms an

entrenched custom of which the municipal leaders should be aware, and for which the municipality

can therefore be held to account." *Welch v. Paicos*, 66 F. Supp. 2d 138, 179 (D. Mass. 1999).

Customs may be unconstitutional, or facially valid. Where the custom alleged is <u>itself</u>

unconstitutional, plaintiffs must show that the custom was sufficiently widespread that it was

effectively endorsed by the municipality.[3] *See Bordanaro*, 871 F.2d at 1156 (municipal liability as to

---

[3] Where the custom (or policy) is facially <u>constitutional</u>, but alleged to have caused a constitutional violation, it is a municipal "inaction" theory and is subject to the standard of deliberate indifference discussed below. *See Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) ("Where the identified policy is itself facially lawful, the plaintiff must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.") (citation omitted); *see also Hahn v. Walsh*, 2009 U.S. Dist. LEXIS 120619, at *12-13 (C.D. Ill. Nov. 24, 2009) ("An 'extremely high degree' of municipal culpability is required to hold a municipality liable for a policy that is not itself unconstitutional, such as a municipality's failure to promulgate procedures or take corrective action. . . . Generally, the failure to act must be the product of 'deliberate indifference' to a plaintiff's constitutional rights."), citing *Lenard v. Argento*, 699 F.2d 874, 875, 886 (7th Cir. 1983). Facially constitutional customs will therefore be considered in the City's "inaction" section, below.

excessive force where the evidence indicated a longstanding and widespread unconstitutional practice of breaking down doors without a warrant). The Plaintiffs make such allegations in their complaints, claiming that: there was "an unwritten policy or custom" in LPD "of permitting paid police informants to plant evidence"; "FA had participated with Defendant Lafferty and with other Lowell police officers in planting evidence on a number of people in Lowell"; and "Lowell police officers in the SIS were aware that FA and FB were willing to plant evidence on suspects" (Sant. Cmplt. ¶¶ 54, 57, 58; Sothy Cmplt. ¶¶ 58, 62, 63).

These bare and conclusory allegations have not been substantiated by the evidence. There is no evidence that any LPD officer, including Lafferty, "participated" in planting evidence. Nobody has reported seeing or learning of any officer doing such a thing. Moreover, every LPD officer who was asked vehemently denied any inclination to be engaged in such a practice. SUF ¶ 94. Similarly, there is no evidence whatsoever of any general "awareness" in SIS that FA and FB were willing to frame suspects. SUF ¶ 49. Even assuming, *arguendo*, that Plaintiffs were able to show that there is a triable issue as to <u>Lafferty's</u> awareness of such, "evidence of a single event alone cannot establish a municipal custom . . . ." *Bordanaro*, 871 F.2d at 1156, citing *Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (plurality opinion). For Plaintiffs' argument of unconstitutional custom even to gain traction it would have to include more than one sole detective and a few isolated cases, and the evidence simply has not borne out Plaintiffs' allegations.

### d.  No Municipal Inaction that Arises to Deliberate Indifference

Since they cannot point to an unconstitutional policy, a direct policymaker decision, or , an unconstitutional custom, Plaintiffs <u>only option</u> is to pursue a municipal "inaction" theory. Municipal inaction includes the failure to train, supervise, discipline, or otherwise "correct" customary actions taken by City police officers. Plaintiffs' principal allegations of "inaction" on the part of LPD are: that SIS "did not maintain proper records or follow other safeguards on the use of informants by its

11

police officers," that Lafferty "recklessly disregarded facts that would have led a reasonable, properly trained police officer to believe that FA had planted evidence on people and then informed on those people to police officers," and that LPD "allowed its police officers, particularly those in the Special Investigations Section, to perform their work with the view that the ends justify the means." Sant. Cmplt. ¶ 56, 43, 61; Sothy Cmplt. ¶ 61, 47, 66).

The hurdle for Plaintiffs is high. "[O]nly where a municipality's failure . . . in a relevant respect evidences a <u>deliberate indifference</u> to the rights of its inhabitants can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983." *DiRico v. City of Quincy*, 404 F.3d 464, 469 n.12 (1st Cir. 2005), citing *City of Canton*, 489 U.S. at 389 (1988) (emphasis added).[4] The Supreme Court has noted that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011), citing *Tuttle*, 471 U.S. at 822-823 ("policy of inadequa[cy]" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). In order to establish deliberate indifference, a "<u>pattern of similar constitutional violations</u>" is "ordinarily necessary." *Connick*, 563 U.S. at 62 (emphasis added). Absent an open pattern of constitutional violations, City policymakers would not be on notice of them, yet, as noted, municipal liability only attaches to <u>deliberate conduct.</u> *See Colbert v. Harris Cty.*, 1996 U.S. Dist. LEXIS 23255, at *32 (S.D. Tex. Mar. 11, 1996) ("To assert a claim for failure to supervise, [plaintiff] must show that the 'policy of inaction' is the functional equivalent of a decision by the County itself to violate the Constitution."), citing *Gonzales v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 757 (5th Cir. 1993).

---

[4] Many of the seminal cases on this issue concern failure to train (*see, e.g.*, *Connick v. Thompson*, 563 U.S. 51, 61 (2011)), but the standard for failure to train and failure to supervise are the same. *See Consolo v. George*, 835 F. Supp. 49, 51 n.1 (D. Mass. 1993) ("Although the Supreme Court cases only discuss failure to train claims, this Court has held that the same standard is equally applicable to failure to supervise claims."). The standard for failure to correct a deficient "culture" is also the same. *See infra*, n. 3.

### i.  <u>No Pattern of Similar Unconstitutional Acts</u>

Plaintiffs can present <u>no</u> evidence—and therefore there is no triable question of fact—of a pattern under which SIS detectives arrested persons whom they knew or should have known were innocent. Again, the alleged violation is either: (a) actual "participation" by a police officer in planting evidence and consequent arrest without probable cause; or (b) falsification of a police report and arrest without probable cause. Either way, there is simply no evidence of such violations and, *a fortiori,* no evidence that policymakers at Lowell were on actual or constructive notice of any such violations. No reports or allegations of such violations were ever filed or presented to LPD. Plaintiffs' expert conceded that there was no evidence of a high instance of complaints against any officer, including Lafferty. SUF ¶ 93.

This case is much clearer than *Connick. Connick* concerned the failure of the Orleans Parish District Attorney's Office to turn over a crime lab analysis of blood preserved on a swatch of fabric to John Thompson's criminal defense lawyers. Thompson ultimately spent 18 years in prison, including 14 on death row, but when the undisclosed crime lab analysis was discovered a month before his execution date and determined to be exculpatory, he was released. *Connick,* 563 U.S. at 54. All parties agreed that this was a *Brady* violation. *Id.* at 57. Thompson then supplied evidence of <u>other</u> *Brady* violations that had occurred out of the same DA's office (four convictions had been consequently overturned in ten years). *Id.* at 62. Nonetheless, the Court found that because they did not involve "failure to disclose blood evidence, a crime lab report, or physical or scientific evidence" they were not sufficiently similar to the matter at hand, and could not have put the DA's office on notice that more training was needed. *Id.* at 62-63. In the matters at hand, Plaintiffs do not even have evidence of a pattern of arrests without probable cause at LPD, let alone a pattern under circumstances <u>similar</u> to those they allege.[5]

_____

[5] Plaintiffs may attempt to argue that a "pattern" existed based on the "unreliability" of FA. FA was

Plaintiffs' allegations similar, but weaker, to the facts of *France v. Lucas*, 2012 U.S. Dist. LEXIS 151344 (N.D. Ohio Oct. 22, 2012). In *France* a confidential informant claimed he had framed several victims in drug transactions, and a police detective involved in the matter was indicted and pled guilty to presenting false evidence. *Id.* at *3-5. Allowing the County's summary judgment motion in the subsequent civil suit, the court found that there was no evidence that any knowledge or suspicion concerning the confidential informant was passed up the chain of command:

> There is no evidence that, until [the informant] admitted to fabricating evidence, the Sheriff's Office was made aware of any formal complaints that one of its informants was fabricating evidence against individuals under investigation. There is simply no legitimate basis for finding that Richland County was deliberately indifferent to the constitutional rights of its citizens with respect to the use of confidential informants.

*Id.* at *37. The court found no "pattern of illegal activity" similar to the detective's alleged violations, and that even if there was such a pattern, the County had no notice of it. *Id.* at 39. In short, there was "no evidence that [the] County had a custom or policy of tolerating or acquiescing in constitutional violations." *Id.* Like the instant matters, issues with the CI in *France* implicated several cases, but they were treated as a <u>single</u> instance for purposes of Monell liability (notice) because information regarding the CI's improper actions was all obtained at the same time.[6]

---

alleged by a criminal defendant to have planted evidence in or around 2003, he was determined to be untrustworthy by members of the DA's office in or around 2006, an SIS sergeant had at one point intended to terminate him, and he violated his LPD contract as a CI on at least the occasions from which controlled buys were made from him. SUF ¶¶ 53-58, 63. First of all, there is no evidence that the first two issues were known to or should have been known by FA's handler, Lafferty or his supervisors. SUF ¶¶ 54, 58. But more importantly, a pattern for the purposes of Monell liability is not a pattern of sloppiness, or even negligence. (The Supreme Court has taken great pains to distinguish Monell liability from negligence.) Plaintiffs must show a pattern of <u>constitutional violations.</u> FA cannot as a matter of law commit constitutional violations. No constitutional violations even conceivably arose from his attempted proffer in 2006, or the controlled buys to which he was reportedly a party. And no pattern can be established from Collins' unsubstantiated allegations, which were never adjudicated. *See Xian Ming Wu v. City of New Bedford*, 2013 U.S. Dist. LEXIS 129688, *10 (D. Mass. Sep. 11, 2013) (no pattern from unsubstantiated complaints). These matters cannot form the basis of a pattern from which to impute municipal liability under Monell.

[6] *See also Manganiello v. City of N.Y.*, 2008 U.S. Dist. LEXIS 44765, at *30-31 (S.D.N.Y. June 10, 2008) (allowing summary judgment for City of New York where plaintiff had been prosecuted for murder

### ii.   No Patently Obvious or Highly Predictable Unconstitutional Consequences

Only "in a narrow range of circumstances" is it <u>not</u> necessary to present a pattern of similar constitutional violations to show deliberate indifference. *Connick*, 563 U.S. at 63. For a city to be liable for inaction under section 1983 <u>without</u> proof of a pre-existing pattern of violations, the unconstitutional consequences of inaction must "patently obvious" or "highly predictable," essentially putting the City on notice of the violations. *Id.* at 64. It bears repeating that this is a <u>very</u> high and stringent standard to meet. *Id.* at 61.

The City recognizes that discovery evidence has revealed some administrative and managerial shortcomings at SIS. These include:

- Detectives in SIS were not consistently provided with a copy of the written policy on CIs. SUF ¶ 67.

- The written policy on handling CIs required detectives to document each interaction with CIs, but they did not do this. SUF ¶ 68.

- The written policy on handling CIs required detectives to "vet" CIs in a certain way before signing them up. This procedure was not fully followed in the case of FA and FB. SUF ¶ 66.

- Detectives could not always remember—and had no consistent written record to determine—which CIs were involved in which cases.[7] SUF ¶ 68.

- Controlled buys were performed from FA and FB while they served as CIs, which was not permitted under the contract CIs had to sign. SUF ¶¶ 61, 62.

The question—and the legal test—is not, however, whether SIS operated <u>optimally</u>, or even well. The question is whether a jury could reasonably conclude that it would be "patently obvious," from any of the above, that a police officer would either fabricate evidence himself or countenance his

---

based partly on the false testimony of an informant, and informant's handler admitted to concerns about the informant's credibility, because even if supervising officers—a lieutenant, a detective sergeant, and a precinct commanding officer—were policy makers for the NYPD, no showing had been made that they had any knowledge of the alleged wrongdoing by the other officers).

[7] Frequently, however, they <u>could</u> determine this, through "buy slips," reviewing affidavits for search warrants, or consulting their own notes. SUF ¶ 7.

informants doing so. Deliberate indifference is "more than just a collection of sloppy, or even reckless, oversights." *Arendale v. City of Memphis*, 519 F.3d 587, 600 (6th Cir. 2008) (citation omitted). Such oversights must put policymakers "on actual or constructive notice that a particular omission . . . causes city employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61 (2011).

Here, it was clear that detectives in SIS would encounter, and work with, CIs. It is undisputed that such work is common in the unit. SUF ¶¶ 2, 5, 6. Given that the information provided by CIs can play a role in arrests for drug or other vice crimes, the City allows that a jury could reasonably conclude that SIS detectives ought to be trained in how to handle informants and how to gauge an informant's reliability, and that their use of informants ought to be monitored. But all of this was done at SIS. All SIS detectives received formal narcotics-policing training by attending a two-week class, either with the DEA or Mass Criminal Justice Training Council. Some Detectives, such as Lafferty, Lavoie and Desmarais, reported attending several more relevant training classes. Most detectives recalled that their training included a module specifically on the use of CIs. Many detectives also testified that they received on-the-job training. Detectives in SIS uniformly understood the need to corroborate information provided by CIs, and offered multiple examples of occasions on which corroboration had been performed. *Id.* ¶¶ 71-73.

The SIS supervisors in 2012 each oversaw four detectives, which is an acceptable or relatively small span of control for a narcotics unit. *Id.* ¶ 74. Supervisors in the unit consistently testified that they understood the need to check in with their detectives frequently and to monitor their use of CIs. For example, Sergeant Noone, a supervisor in SIS during the period in which Santiago and Sothy were arrested, reported the following:

> [A]t the time when I took over there was a very small span of control. I supervised four detectives who managed informants. So I was familiar with their investigations. I worked with them on a regular basis. I tried to be on the street as much as I could with them if I didn't have paperwork or other duties that I had to take care of. I monitored their investigations. If they met with a CI, I had to know about it. And if possible, another officer would go with them. If they wanted to do a controlled purchase involving a CI, I had to be

aware of it or Lieutenant Golner had to be aware of it. . . . And I also wished or was actively harping on them to always do more investigation. Use surveillance. Use other means of investigation to corroborate the CI's information.

Ex. 6, 51:9-52:10; SUF ¶ 75. These are not the words of a deliberately indifferent supervisor. Supervisors kept themselves informed of the cases detectives were building and the CIs they were using. They were briefed when new CIs were signed up. They monitored detectives for changes in behavior or burnout. SUF ¶¶ 76, 77.

It cannot therefore reasonably be disputed that SIS detectives received substantial training, and that SIS supervisors—particularly during the 2012 period which is at stake here—made efforts to inform themselves about and monitor their detectives' use of CIs closely. Supervision and training need not be perfect or exemplary—they simply need to rise to the level at which it would be unreasonable for a jury to conclude that it was patently obvious that constitutional violations would arise. The City submits that no reasonable jury could conclude, from the evidence in this matter, that it made a <u>deliberate or conscious choice</u> to adopt a course of action that obviously would lead to constitutional rights violations. *City of Canton*, 489 U.S. at 389.[8]

---

[8] As noted, Plaintiffs allege generally that there was a "culture" in SIS according to which the "ends justify the means." Presumably, this is the argument that a City custom, not itself unconstitutional, caused Plaintiff's purportedly unlawful arrests. There are numerous problems with this argument. First, the allegation is extraordinarily vague. The "ends justify the means" is associated with statements of utilitarian philosophy, or consequentialism, propounded in the nineteenth century by Jeremy Bentham and John Stuart Mill, according to which actions are justifiable if they cause the "greatest good for the greatest number." Plaintiffs have never made any serious allegation—and there is no evidentiary support for it—that SIS or LPD as a whole somehow subscribed, taught, or otherwise countenanced this utilitarian philosophy. Indeed, Plaintiffs' sole basis for their theory appears to be <u>one statement</u> uttered by Detective Lafferty during his deposition in which he happened to use the phrase "greater good": "[W]e're trying to achieve the greater good, which is to get as much drugs off the streets, guns off the street as we can, and if we have to use an informant that could be selling drugs on his own, unbeknownst to us, then it is what it is. If we find out he's doing it, then we're going to cut him loose." Ex. 1; SUF ¶¶ 82-83. In this statement, Lafferty simply says that he believes it may be worth using an informant who is in fact selling drugs if that informant is able to provide information that leads to getting drugs or guns off the street. He says nothing more. <u>He does not say that **any** means whatsoever—such as constitutional violations—would justify the "end" of seizing drugs</u>. SUF ¶¶ 84, 85, 86. No member of SIS has ever said such a thing. SUF ¶ 81. No member of SIS has done anything from which such a belief might reasonably be inferred.

### iii.  <u>No Causal Connection Between Alleged Omissions and Constitutional Violation</u>

As with any other tort claim, in a section 1983 action there must be "a direct causal link" between the municipal policy or custom and the alleged constitutional deprivation. *City of Canton*, 489 U.S. at 385. Therefore, even if Plaintiffs <u>were</u> able successfully to show that City policymakers exhibited "deliberate indifference" towards the constitutional rights of City residents, which they cannot, they must still show that <u>particular</u> municipal omissions caused the <u>particular</u> rights violations of which they complain. *See id.* at 391 ("the identified deficiency in a city's training program must be closely related to the ultimate injury"). There is no reasonable inference of this.[9]

Plaintiffs cannot explain how any of the deficiencies they attribute to LPD would cause such corruption. The causal link between the City's failure and the constitutional violation must be "closely related." A jury could not reasonably find, for example, a close relation between the failure to record each interaction between a detective and a CI, and a detective's planting evidence or fabricating police reports. Nor could a jury reasonably find that the latter would result (let along "obviously" result) from a failure to fully "vet" CIs before signing them up, or from a failure to read

---

Detectives were well aware of the potential for corruption they faced. SUF ¶ 87. Yet none of the usual indicia of corruption—missing drugs, missing narcotics, changes in lifestyle, etc.—was observed at SIS. SUF ¶¶ 90-93. There were no quotas detectives had to meet. SUF ¶ 89. Further, even if a jury could reasonably infer (which the City submits they could not) that <u>Lafferty</u> subscribed to a full-blown utilitarian philosophy of "ends justify the means," Lafferty's beliefs do not create a custom. A city-wide custom cannot be imputed from one statement by a detective.

[9] For this reason, courts have found that deliberate indifference cannot exist when the incident in question is unusual, or unlikely to be a common reoccurrence. This is because "[a] theory of failure to train and/or supervise derives the necessary deliberate indifference from the likelihood of a reoccurring situation, which, because of a failure to train, will likely result in unconstitutional conduct." *Senna v. Ciccone*, 2015 U.S. Dist. LEXIS 21186, at *21 (D. Mass. Feb. 23, 2015). In *Senna*, this court found that the plaintiff's story according to which police officers falsely claimed he took photographs of them in violation of Massachusetts's witness intimidation statute was a "fact-specific circumstance not likely to re-occur." *Id.*, citing *McGrath v. Town of Sandwich*, 22 F. Supp. 3d 58 (D. Mass. 2014). Similarly, the hypothetical case of a police officer falsifying police reports in order to further a scheme with his CI to obtain arrests is a fact-specific circumstance unlikely to be duplicated. Indeed, the fact that <u>all</u> of the SIS detectives who were asked immediately denounced such a scheme indicates that it is an outlier which would not occur with any frequency.

a policy manual. In *France*, the United States District Court for the Northern District of Ohio, Eastern Division, determined at summary judgment that:

> [T]here is no [causal] nexus between Detective Metcalf's alleged lack of training with respect to confidential informants and his purported unconstitutional activities in this case. Plaintiffs' allegation is not that Detective Metcalf was merely reckless or incompetent in his handling of [the CI], but rather that Detective Metcalf deliberately lied and knowingly conspired with [the CI] and others to frame targets . . . . Yet, Plaintiffs have not explained how additional training would have prevented Detective Metcalf's dishonesty. Indeed, a law enforcement officer's choice to lie, fabricate evidence, or conceal exculpatory evidence would appear to be one that is made despite any training. Accordingly, it cannot be said that any lack of training or supervision of Detective Metcalf by Richland County 'was closely related to or actually caused the injury.'

*France*, 2012 U.S. Dist. LEXIS 151344, *37-38, citing *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). *See also Willis v. Blevins*, 966 F. Supp. 2d 646, 666-67 (E.D. Va. 2013) (dismissing *Monell* count where: "The alleged violations involve the withholding and fabrication of evidence. Unlike the hypothetical in *Canton*, no amount of training would prevent Lt. Blevins's alleged misconduct. . . . Withholding and fabricating evidence are commonly governed by personal rectitude rather than professionally imparted skill sets.'"); *Atkins v. Cty. of Riverside*, 151 F. App'x 501, 508 (9th Cir. 2005) (affirming summary judgment where "[plaintiff's] alleged fabrication of evidence . . . violation[] do[es] not create a basis for county liability. There is no indication that the County needed to train officers to not lie on a police report, or to suppress a lie once told."). Similarly, Plaintiffs can point to no omission in training or supervision by the City that could reasonably be found to have caused Lafferty to fabricate a police report or tamper with evidence.[10]

---

[10] There is some evidence in the record that FA and FB should have been terminated as informants before the 2012 incidents involving Plaintiffs Santiago and Sothy. Plaintiffs may argue, therefore, that a reasonable jury could conclude—if it finds Santiago and Sothy credible—that if it had not been for LPD's failure to terminate FA and FB, the Plaintiffs would never have been arrested. This argument fails, however, because a jury could not reasonably conclude that LPD's failure to terminate FA or FB was a <u>proximate</u> cause of Plaintiffs' alleged constitutional violations. It is well established that Monell liability requires a <u>direct</u> causal link between a municipal policy or custom and the alleged constitutional deprivation, not "but for" causation. *See City of Canton*, 489 U.S. at 392 (no municipal liability based on a plaintiff "point[ing] to something the city 'could have done' to prevent the unfortunate incident" since virtually every plaintiff will be able to do this and it "would

.

### iv. <u>No Prior Failure to Discipline or Investigate</u>

Plaintiffs allege that "The Lowell Police Department has a policy or custom of failing to properly investigate allegations of misconduct by its police officers who violate the rights of people in Lowell and of failing to discipline officers for these violations" and that "The Lowell Police Department has a policy or custom of failing to properly investigate allegations of misconduct when Lowell police officers are sued for civil rights violations." Sant. Cmplt. ¶¶ 59, 60; Sothy Cmplt. ¶¶ 64, 65. This is another municipal "inaction" theory, and is subject to the same standards as those noted above. *See Fox v. Smith*, 2008 U.S. App. LEXIS 27864, at *9 (6th Cir. Sep. 19, 2008). This argument is a non-starter. There is no evidence of the City's failure to investigate either Lafferty or allegations of misconduct lodged against other police officers. SUF ¶ 93. While LPD did not perform an internal affairs investigation of <u>this</u> situation, it was because LPD was cooperating with the investigation undertaken by the Essex County District Attorney's office and believed that the investigation was more appropriately performed by a third party. SUF ¶ 46. Moreover, even if Plaintiffs were able to demonstrate that the adequacy of LPD's response is in dispute, any such purported inadequacy cannot, as a matter of logic, serve to put LPD on notice of <u>prior</u> failures.

## CONCLUSION

For all of the above reasons, the City respectfully urges the Court to allow its summary judgment motion, entering a judgment for the City in both the Santiago and the Sothy matters.

---

result in *de facto respondeat superior* liability on municipalities"). Each incident that even raises a question about whether or not FA or FB should have been terminated—or in fact signed up/reactivated in the first place—occurred well before Plaintiffs' arrests. SUF ¶¶ 53, 55, 58, 61, 62. As such, even if Plaintiffs were able to show that those incidents demonstrate failures on the City's part, and those failures could be imputed to City policymakers, they could not reasonably be found to be a proximate cause of Plaintiffs' alleged injuries. It is implausible that merely signing up a rogue informant, or failing to terminate one, would directly result in police corruption years later in the form of planting evidence or fabricating police reports. Such a result could not be predicted or reasonably foreseen and municipal liability would not attach.

May 19, 2016                          RESPECTFULLY SUBMITTED,

                                      DEFENDANT City of Lowell,
                                      By Its Counsel,

                                      /s/ Rachel M. Brown
                                      Christine P. O'Connor, City Solicitor
                                      BBO #567645
                                      Kenneth J. Rossetti, Assistant City Solicitor
                                      BBO #637135
                                      Rachel M. Brown, Assistant City Solicitor
                                      BBO #667369
                                      Hannah Pappenheim, Assistant City Solicitor
                                      BBO #691721
                                      City of Lowell Law Department
                                      375 Merrimack Street, 3rd Floor
                                      Lowell, MA 01852-5909
                                      Tel: 978-674-4050
                                      Fax: 978-453-1510
                                      co'connor@lowellma.gov
                                      krossetti@lowellma.gov
                                      rbrown@lowellma.gov
                                      hpappenheim@lowellma.gov


## CERTIFICATE OF SERVICE

I certify that on this day a true copy of the above document was served upon the attorney of record for each party via CM/ECF.

Date: May 19, 2016              /s/ Rachel M. Brown
                                Rachel M. Brown