**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| JONATHAN SANTIAGO, | ) | Civil Action No. 13-12172-IT |
| Plaintiff, | ) | |
| v. | ) | |
| THOMAS LAFFERTY, *et al.*, | ) | |
| Defendants. | ) | |
| NEL SOTHY, | ) | Civil Action No. 13-12302-IT |
| Plaintiff, | ) | |
| v. | ) | **LEAVE TO FILE EXCESS** |
| THOMAS LAFFERTY, *et al.*, | ) | **PAGES GRANTED 6/28/16** |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS THOMAS LAFFERTY AND CITY OF LOWELL'S**
**MOTIONS FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Defendants Thomas Lafferty and the City of Lowell are not entitled to summary judgment.

Their motions[1] rely on disputed facts, which they ask the Court to view in their own favor.

The evidence shows that the Lowell Police Department ("LPD") ignored its policies

regarding the use and management of confidential informants for more than a decade. The LPD

followed an unwritten custom or practice, in which narcotics unit supervisors allowed detectives to

use unreliable informants. Defendant Lafferty's supervisors let him use an informant who was

alleged to have planted evidence in the past, was actively working as a drug dealer while serving as an

informant, and whom other LPD officers had stopped using due to unreliability.

The LPD's custom allowed Lafferty to believe the ends justified the means. Thus, he used

confidential informants despite knowing they were unreliable because the informants allowed

Lafferty to make easy arrests. Lafferty wrote police reports and testified in a false or misleading

---

[1] There are three pending motions for summary judgment. Defendant City of Lowell filed one motion covering both of the above-captioned cases (*Santiago* ECF #157); Defendant Lafferty filed a separate motion for each case (*Santiago* ECF #153 and *Sothy* ECF #68). Plaintiffs oppose all three motions and address each in this memorandum.

manner to protect his informants and make criminal charges "stick." In Plaintiffs' cases, Lafferty falsely claimed he saw things that actually were reported to him by an informant. In other cases, Lafferty felt the informant's information was "too easy," but made arrests anyway. Lafferty's misconduct was caused by a widespread, well-settled custom and practice of the LPD. Because the facts are disputed, the Court should deny Defendants' motions.

**FACTS**[2]

## I.      The Lowell Informant Scandal

On October 10, 2012, a man the parties have referred to as "FB" met with two Massachusetts State Police troopers to provide information about a drug dealer in Lowell. FB told the troopers that this drug dealer, whom the parties have referred to as "FA," was working as a confidential informant for the LPD. [3] FB told the troopers that FA was setting people up in Lowell by planting drugs on them. FB said he knew this because he had helped FA plant drugs on several people. PSOF ¶¶ 1, 3.

The troopers began a preliminary investigation of FA. They learned that FA had previously worked as a confidential informant for the State Police, who determined that he was untrustworthy. PSOF ¶ 2. FB told the troopers about at least six cases in which FA or FB had planted evidence that was then recovered by Lowell police officers. FB described one case in which FA had planted drugs in the gas-cap compartment of a Honda Civic driven by a man named Jonathan. This description corresponds to Defendant Lafferty's arrest of Plaintiff Jonathan Santiago. FB described another case

---

[2] Pursuant to Local Rule 56.1, Plaintiffs have filed responses to each of Defendants' statements of facts to identify the facts genuinely in dispute and for which a trial is necessary. Because Defendants' statements omit most of the evidence regarding Plaintiffs' municipal liability claim, Plaintiffs have submitted their own statement of facts ("Plaintiffs' Statement of Facts" or "PSOF").

[3] Plaintiffs use the terms "confidential informant" and "informant" interchangeably.

in which FA set up an Asian male by planting cocaine in the gas-cap compartment of the man's Toyota Scion. This description corresponds to Lafferty's arrest of Plaintiff Nel Sothy. PSOF ¶ 4.

The State Police alerted the LPD and the Middlesex County District Attorney's Office about FB's statements. Assistant District Attorney ("ADA") Cara Krysil, who was chief of the Middlesex DA's Lowell region at the time, began an investigation to determine the scope of affected cases. She recognized FA's name, having prosecuted a case six years earlier in which FA was accused of planting evidence while working as an LPD informant. She learned that the LPD's narcotics unit— known as the "Special Investigations Section" or "SIS"—was having difficulties identifying cases involving FA and FB because it did not keep records of informant activities. The department could only identify cases involving these informants through Defendant Lafferty's memory. PSOF ¶¶ 5-6. To this day, because of the lack of recordkeeping, there is no way to confirm whether the LPD has identified all cases involving FA or FB. PSOF ¶ 8.

## II.    Proper Use of Confidential Informants

Confidential informants ("CIs") can provide narcotics detectives with critical information about criminal activity that is not available from other sources. CIs have this information because they are often criminals themselves. Thus, while CIs can be a valuable law enforcement tool, without proper procedures in place CIs can compromise police investigations, destroy an agency's credibility, endanger officers' lives, and foster police corruption. To minimize these risks, it is critical that police officers use proper controls when dealing with informants. PSOF ¶ 9.

Proper controls begin with a police department's formal written policy for managing the use of CIs. Among the requirements of a proper policy, two are critically important: vetting and recordkeeping. Vetting is the process of investigating potential informants before deciding whether to use them. It begins by examining the potential CI's motivation for working with the police. There

are several common and acceptable motivations, such as providing information in exchange for favorable treatment in the CI's own criminal case or in exchange for money. Common unacceptable motivations include eliminating criminal competition, developing police protection, or gathering information about a police department's investigative methods and technologies. It is critical that police officers understand a potential CI's motivation in deciding whether to use him or her as an informant. Supervisors should review all available information and meet with the potential informant before approving him or her. PSOF ¶¶ 10-12.

Vetting also requires a thorough background check of the potential informant. This includes reviewing the potential CI's criminal history, interviewing him or her, and checking with narcotics investigators from other law enforcement agencies to see if they have additional information about him or her. The latter requirement helps ensure that the potential CI has not been deemed unreliable by another agency. Vetting is an ongoing process; after a supervisor has approved an individual to be used as a CI, investigators must continually assess an informant's reliability and credibility when he or she provides information to police. PSOF ¶¶ 13-14.

The second critical element of an informant policy is recordkeeping. Narcotics units must maintain files on every CI its officers use. Each file should contain documentation from the initial background investigation, as well as a description of all information the CI has provided to investigators and documentation about the reliability of that information. If an informant is deemed to be unreliable for any reason, this should be clearly marked in the file along with documentation explaining the basis for that determination. PSOF ¶ 15.

Proper documentation about informants is essential for several reasons. Narcotics officers frequently reference a CI's reliability when applying for search warrants and while testifying in criminal cases. Having documentation about what information a CI has provided in the past and

whether that information has proved reliable allows officers and supervisors to confirm that an officer's affidavit and court testimony are accurate and truthful. The documentation can be used to substantiate an officer's testimony if necessary. Documentation also lets supervisors review the complete history of information provided by an informant, which may reveal patterns causing concern. If an issue with an informant's credibility arises, proper documentation allows narcotics officers to quickly identify all cases in which that CI was involved. PSOF ¶ 16.

Of course, a written policy by itself is not enough to ensure proper management of informants. Police departments must ensure that every officer in the narcotics unit receives, reads, and follows the policy. Supervisors must enforce the policy and hold officers accountable when necessary. Properly run police departments also have systems of oversight to monitor and audit a narcotics unit's activities. This oversight includes having a member of the department's command staff periodically review the unit's police reports and informant files to ensure compliance with departmental policies. PSOF ¶¶ 17-18.

## III.   Noble Cause Corruption

In 1972, the Knapp Commission[4] coined the term "noble cause corruption." The term, now well known in the law enforcement community, refers to corruption committed in the name of good ends. It is a mentality that says bending the rules is acceptable if it means getting the "bad guys" off the street. One example of noble cause corruption is police officers' lying or exaggerating in reports and court testimony in order to make a charge "stick." Police officers operating with the "noble cause" mindset do not view their behavior as improper or corrupt; they see taking shortcuts as acceptable because they are doing it for the greater good of the community. PSOF ¶ 20.

---

[4] Formally known as the Commission to Investigate Alleged Police Corruption, the Knapp Commission was formed in 1970 to investigate corruption in the New York City Police Department.

Good supervision is a crucial safeguard against noble cause corruption. Proper supervision is particularly important in vice and narcotics units. Police administrators around the country know that there is a great danger of corruption within these units because officers frequently come in contact with large amounts of cash and illegal drugs, and operate with more autonomy than patrol officers. It is widely accepted that narcotics units with poor supervision create a particularly high-risk environment for police corruption. PSOF ¶¶ 19, 21.

## IV.    The Lowell Police Department's Use of Confidential Informants

The LPD's formal written policy regarding the use of confidential informants is General Order No. 89-03 (the "1989 Informant Policy"). The 1989 Informant Policy took effect on December 20, 1989, at a time when police use of informants was in the national news. Four months earlier, the Supreme Judicial Court ("SJC") had decided *Commonwealth v. Lewin*, 405 Mass. 566 (1989), which involved a Boston police officer who had made up a fictitious informant to obtain search warrants more easily. The 1989 Informant Policy was an appropriate policy at the time—it required SIS detectives to conduct thorough background investigations before using informants and to maintain CI files recording all information each informant had provided and whether it turned out to be reliable. The policy requires "strict compliance" by all SIS detectives. PSOF ¶¶ 23-26.

Although the 1989 Informant Policy provided appropriate safeguards, the LPD either never implemented the policy or stopped following it at least twelve years before the events involved in these cases.[5] At the time of Plaintiffs' arrests in 2012, many SIS detectives had never seen or heard of the 1989 Informant Policy. Defendant Lafferty first learned of the policy while preparing for his

---

[5] Plaintiffs were permitted to take *Monell* discovery dating back only to approximately 2002, when the SIS first used FA as an informant. *See Santiago* ECF #38 and #47 (addressing "the scope of municipal discovery" authorized at the initial scheduling conference). Discovery showed that the policy was not followed as far back as 1999, when Detective Samaras joined the SIS. This was 13 years before Plaintiffs were arrested.

deposition in this case. Three other detectives saw the policy for the first time when it was shown to them during their depositions. Another three detectives first saw the policy after Plaintiffs' arrests, around the time that the DA's office was investigating allegations that FA and FB had planted evidence. These detectives have worked in the SIS at various times over a span of many years, from 1999 to present. PSOF ¶¶ 29-30.

During this period, the sergeants and lieutenants in command of the SIS either did not know about the 1989 Informant Policy or did not require SIS detectives to follow the policy. Sergeant James Trudel, who supervised the unit from 2000 to early 2007, did not require SIS detectives to follow the policy while he was in charge. Then-Lieutenant James McPadden, who took over for Trudel in 2007, testified that he had seen the 1989 Informant Policy ten years before taking over the unit but that he did not ensure that the policy was being followed. Lieutenant James Hodgdon, who took over for McPadden in late 2007, testified that he knew the policy was not being followed. Rather than enforce the policy, Hodgdon allowed SIS detectives to operate according to "the past practice of the unit." Sergeant Jonathan Noone and Lieutenant Barry Golner became SIS supervisors in 2010 and were in command of the unit at the time of Plaintiffs' arrests in 2012. Sergeant Noone testified that, as an SIS supervisor, he was aware that the practice within the unit did not comply with the 1989 Informant Policy. Lieutenant Golner testified that he allowed officers to follow department policies "informally." PSOF ¶ 31.

The SIS operated according to unwritten customs and practices, which were contrary to the 1989 Informant Policy and to generally accepted law enforcement procedures for the management of CIs. SIS detectives did not maintain records about each informant's reliability. They did not document their contacts with CIs or the information provided by CIs. They did not document whether information provided by an informant proved to be reliable or unreliable. PSOF ¶ 36.

7

Similarly, SIS detectives did not thoroughly vet potential informants to determine whether they were suitable for use as CIs. Defendant Lafferty, who joined the SIS in 2005, testified that he did not know about his CIs' motivations for providing information to police because he had never been instructed to assess a CI's motivation. SIS detectives did not always obtain a potential CI's criminal history before using him or her. Even when detectives did obtain the criminal history, they did not always review it. Had SIS supervisors and members of the LPD command staff reviewed SIS informant files, as is standard practice in a properly supervised narcotics unit, it would have been obvious that SIS detectives were not following department policy. PSOF ¶¶ 37-38.

The lack of recordkeeping in the SIS made it impossible to properly supervise the unit. Because SIS detectives did not maintain records about CI activities, supervisors could not review CI files to ensure that officers were accurately describing an informant's history of reliability in police reports and search warrant affidavits. SIS supervisors testified that they simply asked the detectives if the CIs were reliable and trusted that their answers were accurate. This is not proper supervision. PSOF ¶ 39.

A lack of proper supervision creates an atmosphere conducive to corruption, particularly noble cause corruption. When officers are not required to follow a department's formal policies, they may come to believe that they can cut other corners to achieve their goal of arresting criminals. Defendant Lafferty displayed this mindset. He testified that he suspected his informant FA was dealing drugs while also working as a CI. In a properly run narcotics unit, an informant would be automatically terminated based on suspicions of drug dealing, and the handling officer would start a criminal investigation of the informant. Lafferty did not do this because, as he explained in his deposition, "I was actively using [FA] to make cases throughout the City of Lowell. . . . [FA's drug dealing] is not okay, but like I said, we're trying to achieve the greater good . . . and if we have to use

an informant that could be selling drugs on his own, unbeknownst to us, then it is what it is." PSOF

¶¶ 40-41.

## V.     Informant FA

FA was a drug dealer in Lowell. His criminal activity is well known around the community,

including within the LPD and the Massachusetts State Police. FA first became an informant for the

SIS in 2002. There is no evidence that any vetting occurred when FA was signed up. FA's entire

informant file contains two pieces of paper—a partially completed "Informant Data Card" and an

informant agreement. The documents are signed but not dated. PSOF ¶¶ 43-44.

Former Lowell detective William Samaras was FA's control officer from 2002 until

approximately 2005. In May 2003, Lowell police officers arrested a man named Matthew Collins for

cocaine trafficking. The arrest was the result of information FA had provided to Detective Samaras

shortly before officers stopped Mr. Collins's car. The police report did not disclose that a CI had

been involved in the case. PSOF ¶¶ 45-46.

Mr. Collins alleged that the drugs had been planted in his car and took the case to trial. The

trial resulted in a hung jury. Before retrial, Mr. Collins moved for disclosure of the CI's identity.

Then-Superior Court judge Geraldine Hines allowed the motion and ordered the Commonwealth to

disclose the informant's name. The Commonwealth disclosed FA's name and confirmed that FA

was the informant used in Mr. Collins's case. After FA's identity was disclosed, the Commonwealth

agreed to have the seized drugs tested for purity. The results showed low purity. The prosecutor felt

that the low purity lent credibility to the claim that FA had planted the drugs. PSOF ¶¶ 47-48.

FA continued to work as an informant after the *Collins* case. In August 2004, the LPD

arrested FA for felony distribution of counterfeit goods. Although this arrest violated FA's

informant agreement, which prohibits criminal activity while working as an informant, the SIS

continued to use him. In August 2005, the Cross Borders Initiative—a joint task force between the Massachusetts State Police, LPD, and other agencies—arrested FA for felony cocaine trafficking. In October 2006, FA pled guilty to a reduced charge of possession with intent to distribute and received a sentence of probation. PSOF ¶¶ 50-51.

Around the time of FA's arrest for cocaine trafficking, Sergeant Trudel—who was in charge of the SIS at the time—learned that FA was informing for another police department in an effort to get favorable treatment on his pending cases. Sergeant Trudel deemed FA to be unreliable and instructed Detective Samaras not to use him further. Sergeant Trudel also learned about FA's cocaine trafficking arrest by the Cross Borders task force. Trudel testified that this arrest would also have warranted terminating FA. Trudel testified that, because he had determined FA was unreliable, FA was not to be used as an informant by SIS officers in the future. Lafferty was a member of SIS when this occurred. There is no documentation in FA's informant file about Sergeant Trudel's determination that FA was unreliable and not to be used by SIS officers. PSOF ¶¶ 52-54.

In December 2008, FA was arrested for assaulting a Lowell police officer. About a month later, FA's attorney contacted Defendant Lafferty and explained that FA was interested in informing for the SIS in exchange for a deal in his criminal case. FA's attorney explained that FA had previously worked as an informant for Detective Samaras and Sergeant Trudel as well as the State Police. PSOF ¶ 56.

Defendant Lafferty did not vet FA's background or take any action to determine if FA was reliable, credible, or suitable for use as a CI. Defendant Lafferty did not check FA's criminal history and therefore did not learn that FA had been arrested for cocaine trafficking and was still on probation for cocaine distribution. Lafferty did not contact Detective Samaras to learn about FA's past performance as a CI. Instead, Lafferty approached his supervisor, Lieutenant Hodgdon, and

said that FA's attorney "says [FA] can do some really good work. . . . Can I give it a shot?" Hodgdon

claims he told Lafferty to call Assistant District Attorney Thomas O'Reilly to get approval to use

FA. Lafferty testified that O'Reilly said he "wasn't crazy about the idea because [O'Reilly] didn't care

for that guy," but that O'Reilly nevertheless told Lafferty he could "give [it] a shot." Lafferty did not

ask O'Reilly the reason for his opinion of FA. ADA O'Reilly did not recall any such conversation

and testified that he has no authority over whom the LPD uses as CIs. Had he been asked whether it

was acceptable to use FA as an informant, O'Reilly would have said no. PSOF ¶ 57-59.

After Defendant Lafferty began using FA as an informant, Lafferty began to suspect that FA

was a drug dealer. Lafferty testified that, had he not been using FA as an informant, he would have

acted on these suspicions. Lafferty chose not to investigate FA's potential drug dealing because he

was using FA as an informant. PSOF ¶ 60.

Other members of the SIS did investigate FA's drug dealing. Between June and August

2009—approximately six months after Lafferty began using FA—Detective David Lally used one of

his CIs to conduct two controlled purchases of cocaine from FA. Other SIS detectives assisted with

the investigation. Detective Lally was aware that FA was working as Lafferty's informant at the time.

Lieutenant Hodgdon, the SIS supervisor, knew that FA sold cocaine to Detective Lally's CI,

violating FA's informant agreement and the law. Nevertheless, Hodgdon did not require Lafferty to

terminate FA as an informant. Lafferty continued using him. PSOF ¶ 61-62.

Lafferty has testified inconsistently about how many cases FA has been involved in as a

Lowell police informant. In his deposition, Lafferty said FA was involved in exactly 10 cases

between 2009 and 2012. At a suppression hearing in December 2011, however, Lafferty testified

that he had used FA over 50 times and that 75 percent of those 50 times had resulted in an arrest. In

arrest reports and in testimony during that motion hearing, Lafferty described FA as a reliable

informant. At his deposition, however, Lafferty testified that "more often than not" he was unable

to corroborate FA's information. Another detective in the SIS testified that when Lafferty had a case

involving an informant, the detective assumed it was FA because "Lafferty always used [FA]."

Because there is no documentation about FA's activities as an informant, there is no way to know

whether the LPD has identified all cases in which FA was involved. PSOF ¶¶ 63-64.

## VI.    Informant FB

In March 2010, Defendant Lafferty began using FB as a confidential informant. FA had

referred FB to Lafferty. Lafferty did not conduct a complete background investigation of FB before

using him as a CI. Lafferty testified that the sign-up process entailed meeting with FB, asking him

what he could do, and then signing the paperwork. Lafferty testified that he got a copy of FB's

criminal history, but the criminal history Lafferty put into FB's file is for a different person with the

same name. PSOF ¶¶ 65-67.

After FB began working as Lafferty's informant, FB would call Lafferty for help when FB

was stopped by police officers in Lowell while driving. Lafferty testified that he would then reach

out to the officer who had stopped FB and ask the officer for a favor by letting FB off. FB's driver's

license was suspended throughout this period. PSOF ¶ 69.

Properly trained and supervised narcotics investigators know that this behavior—intervening

to help an informant out of a police encounter—is improper. It sends a message to the informant

that he is being protected by the police. It lets the informant believe that it is acceptable to break the

rules once in a while, a belief that can escalate into breaking the law in order to make cases for the

handling officer. PSOF ¶ 70.

In December 2010, approximately eight months after FB started working as Lafferty's

informant, another SIS detective began investigating FB for drug dealing. Using one of his own CIs,

Detective David Lavoie conducted three controlled purchases of cocaine from FB. After conducting

the controlled purchases, the SIS executed a search warrant on FB's home. SIS supervisor

Lieutenant Golner told Lavoie during execution of the search warrant that FB was Defendant

Lafferty's informant. FB should have been terminated as an informant as a result of the controlled

buys, but was not. PSOF ¶¶ 71-73.

## VII.   Jonathan Santiago's Arrest

On February 21, 2012, Plaintiff Jonathan Santiago spent the evening at his friend Crystal's

apartment on Gorham Street in Lowell. Mr. Santiago drove there in his car, a red Honda Civic. He

arrived around 6:30 or 7:00 that evening. After an hour or so, Mr. Santiago's friend Luis asked him

for a ride home. They went outside to let Mr. Santiago's car warm up. PSOF ¶¶ 74-75.

Mr. Santiago saw two men in the parking lot. One of the men was FA, whom Mr. Santiago

had met while living in the same Lowell neighborhood years earlier. Mr. Santiago had heard rumors

that FA was a drug dealer who set people up in exchange for being allowed to sell drugs. Mr.

Santiago described the other man as FA's cousin. Unbeknownst to Mr. Santiago, this man was also a

CI working for Defendant Lafferty. This man shall be identified here as "FC." PSOF ¶¶ 76-77.

FA began talking to Mr. Santiago and his friend Luis. FA told them to come inside his

apartment, located in the same complex, to look at his new television. They obliged, and FA then

invited Mr. Santiago to go get a drink at a bar. Mr. Santiago said he would think about it while he

went to drop Luis off at home. When Mr. Santiago walked back to his car, FC was sitting in the

driver's seat playing with the radio. PSOF ¶¶ 78-79.

After driving Luis home to Temple Street, Mr. Santiago returned to his friend Crystal's

apartment about 15 to 20 minutes later. FA and FC were not outside when Mr. Santiago returned, so

he went back to Crystal's apartment for another hour or so. When Mr. Santiago left at around 9:00

or 9:30 p.m., FA was in the parking lot. Mr. Santiago agreed to go to a bar with FA to get a drink. Mr. Santiago asked if FA wanted a ride, or if FA would drive them. FA insisted that each person take his own car. FA told Mr. Santiago to follow him to the bar. Mr. Santiago followed FA as they drove toward downtown Lowell. PSOF ¶¶ 80-82.

At the same time that Mr. Santiago was following FA to the bar, FA called Defendant Lafferty. Lafferty described this as a 15-second conversation in which FA told Lafferty that "a guy" driving a "red car" was "doing some loops" near Gorham and Union Streets and "trying to sell some coke." Lafferty did not ask any of the standard law enforcement follow-up questions about the basis for FA's knowledge. He simply told FA, "I'll go try and pick it up." PSOF ¶¶ 83-84

Detective Lafferty radioed a description of Mr. Santiago's car to other SIS detectives and told them a CI had said there were narcotics inside. As Mr. Santiago followed FA onto Westford Street, an SIS detective was waiting for him. The detectives chose to stop Mr. Santiago as he passed through a school zone. Mr. Santiago had not committed any traffic violations. PSOF ¶¶ 85-87.

Defendant Lafferty asked Mr. Santiago for his consent to search the car. Mr. Santiago responded, "Sure. I don't have anything to hide." Lafferty then requested a canine unit from the Chelmsford Police Department. When the dog began searching the car, it went straight to the gas-cap area and started scratching. Defendant Lafferty reached into Mr. Santiago's car and pulled the latch for the gas-cap compartment door. Inside the gas-cap compartment, the detectives found a sock containing a white powdery substance that tested positive for cocaine. PSOF ¶¶ 87-88.

The substance recovered from Mr. Santiago's car did not belong to him. Detective Lavoie testified that just after police recovered the substance, he overheard Mr. Santiago say something to the effect of "I didn't want to believe it, but people say he's a rat." Mr. Santiago was handcuffed and taken to the Lowell police station where he was booked and locked in a cell for six to seven hours

14

before posting bail. Mr. Santiago's bail was increased the next day at arraignment, and he was held for several more hours in the courthouse lockup until his family could post his bail. PSOF ¶¶ 89-91.

Defendant Lafferty prepared a police report about the arrest in which he substituted himself as the source of the information he had received from FA. Lafferty claimed to have seen Mr. Santiago driving in loops around the Gorham Street area when in fact this was a claim FA had made to Lafferty. Lafferty wrote that he followed Mr. Santiago as he drove in a loop around the area; this was not true. Lafferty claimed that SIS detectives stopped Mr. Santiago for a marked-lane violation; this also was not true. Mr. Santiago had not committed any traffic violations. PSOF ¶ 92.

Lafferty caused Mr. Santiago to be charged with, among other things, cocaine trafficking and trafficking in a school zone. Defendant Lafferty did not, however, conduct any follow-up investigation to determine if Mr. Santiago was actually a drug dealer or if he was connected to any other drug activity in Lowell. The day after Mr. Santiago's arrest, FA called Lafferty and asked if he "had any luck with that car." A properly trained and supervised narcotics investigator would question why an informant wanted to know, as this type of inquiry can indicate improper motives for informing. Lafferty did not do this; he told FA, "Yeah, we stopped it and found some coke." The Commonwealth dismissed all charges against Mr. Santiago on March 6, 2013. PSOF ¶¶ 93-96.

During this litigation, the substance seized from Mr. Santiago's car was tested for purity. The results showed that the substance contained approximately 5 percent cocaine. Less than 10 percent cocaine is considered low purity. Low purity does not definitively prove that drugs were planted, but it is consistent with the claim that the drugs were planted and makes it more likely that the drugs were planted. PSOF ¶¶ 97-98.

## VIII.   Nel Sothy's Arrest

On August 1, 2012, Plaintiff Nel Sothy went to the Azores Club in Lowell with his girlfriend and members of her family. Mr. Sothy drove there in his car, a black Toyota Scion. FA was at the Azores Club that night. Mr. Sothy had met FA once before at the bar but did not know him beyond that. Mr. Sothy had heard FA was a drug dealer. PSOF ¶¶ 99-100.

At some point during the evening, Mr. Sothy went to use the bathroom. When he walked into the men's room, he saw FA engaged in what appeared to be a drug transaction with other people. FA asked Mr. Sothy if he wanted to buy cocaine; Mr. Sothy said no. Later that evening, Mr. Sothy drove his girlfriend's aunt home. When he returned to the bar, Mr. Sothy parked his car directly in front of the entrance. This was where FA liked to park his car. PSOF ¶¶ 101-02.

FA called Defendant Lafferty and told him there was an Asian male who drives a Scion trying to sell cocaine at the Azores Club. Defendant Lafferty did not ask FA for any additional information; he went to the Azores Club and "set up surveillance" by parking directly across the street from the bar. Just before 1:00 a.m., Lafferty saw Mr. Sothy and three women leave the Azores Club and drive to Santoro's, a nearby restaurant. Mr. Sothy and his group walked out of the Azores Club together. They got into the car together. Mr. Sothy did not access the gas-cap compartment in any way. PSOF ¶¶ 103-04.

Defendant Lafferty followed Mr. Sothy's car to Santoro's. He radioed other members of the SIS that he was going to approach the vehicle. SIS Detective Michael Kandrotas and Sergeant Jonathan Noone, one of the SIS supervisors, arrived at the scene. The officers ordered Mr. Sothy and his passengers from the car at gun point. Without asking for Mr. Sothy's consent, one of the officers entered Mr. Sothy's car and began searching through a bag and the glove compartment. Mr.

Sothy asked, "What are you looking for?" The officer responded, "You know what the [f---] we're looking for." PSOF ¶¶ 105-06.

Defendant Lafferty then said, "Check the gas cap." Mr. Sothy replied, "Go ahead and check the gas cap. There's nothing in there." Lafferty pulled the latch to open the gas-cap compartment door and a plastic bag containing a white powdery substance fell to the ground. Mr. Sothy immediately denied that the substance was his. Mr. Sothy's passengers began accusing the officers of planting drugs in Mr. Sothy's car. Mr. Sothy was handcuffed and taken to the Lowell police station, where he was held in custody overnight. He was transported the next morning to court, where he spent most of the day in a holding cell until his family and friends could arrange to pay the $5,000 for Mr. Sothy's bail. PSOF ¶¶ 107-109.

Defendant Lafferty caused Mr. Sothy to be charged with cocaine trafficking. He prepared a police report falsely claiming to have seen Mr. Sothy walk out of the Azores club, take a bag of white powder from his pocket, and put it into the gas-cap compartment before driving away. This did not happen. In addition, Lafferty claimed in his report to have received information from FA about Mr. Sothy "during the past week." This was intentionally misleading: Lafferty received the call from FA approximately 30 minutes before Mr. Sothy's arrest. Lafferty could not have received information about Mr. Sothy and his Scion earlier in the week because Mr. Sothy's car had been in the shop getting repaired. PSOF ¶¶ 111, 113.

Four days after Mr. Sothy's arrest, LPD Deputy Superintendent Arthur Ryan provided a statement to the *Lowell Sun* newspaper describing Mr. Sothy's arrest as a "substantial drug bust." Deputy Ryan recognized Defendant Lafferty by name and praised the SIS for its "excellent work" arresting Mr. Sothy. The Commonwealth dismissed all charges against Mr. Sothy on March 22, 2013. PSOF ¶¶ 112, 114.

17

During this litigation, the substance seized from Mr. Sothy's car was tested for purity. The laboratory results showed that the purity was too low to be quantified. PSOF ¶ 115.

## IX.     The City of Lowell's Failure to Investigate

Sometime in late 2012, the LPD learned of the allegations that FA and FB had planted evidence while working as Defendant Lafferty's informants. Kenneth Lavallee was the LPD's superintendent at the time. Captain Jonathan Webb, who oversaw the Investigative Services Division, which includes the SIS, told Lavallee that he "felt strongly" all SIS policies and procedures had been followed properly. Lavallee did not ask Webb for any further information. Webb testified that he did not know whether the policies had been followed but that he did not investigate the issue because he "had no indication that the procedures hadn't been followed properly." PSOF ¶¶ 116-19.

Deborah Friedl became the LPD's acting superintendent after Lavallee retired in March 2013. Although the Middlesex and Essex County District Attorney's offices had opened a criminal investigation into the allegations of informants planting evidence, Friedl did not order an internal investigation. During the DAs' investigation, Essex First Assistant District Attorney Jack Dawley asked Lowell Police Captain Thomas Kennedy to obtain relevant documents from the SIS. Kennedy drafted a "Request for Information" to Lieutenant Golner. When Superintendent Friedl reviewed Kennedy's request, she instructed him to change the language to avoid implying that there had been any allegation of misconduct by Defendant Lafferty. Friedl instructed Kennedy to describe the investigation as targeting the informants but not Lafferty. PSOF ¶¶ 121-22, 132-33.

During his criminal investigation, ADA Dawley recognized that the SIS informant files were missing "obvious documents," such as historical documentation about information each informant had provided along with a review of whether that information had been credible and reliable. He learned of numerous "red flags" regarding FA's lack of credibility. As ADA Dawley began to review

police reports of affected cases, he concluded that some of Lafferty's arrests seemed "too convenient" and happened too quickly to have been "real world" cases. ADA Dawley described Mr. Santiago's arrest as one such case. PSOF ¶¶ 134-36.

ADA Dawley met with Superintendent Friedl at the conclusion of his investigation. During that meeting, they decided that the LPD would receive no written documentation about the investigation's findings, or the basis for those findings, other than a press release. On August 9, 2013, the LPD issued a press release stating, "We are confident our current policies and practices governing the use and tracking of confidential informants conform to the best practices in law enforcement." Despite issuing this press release, Superintendent Friedl testified that she did not know what the DAs' investigation had uncovered about the practices within the SIS. She testified that, even after the investigation concluded, she still believed SIS detectives had followed the 1989 Informant Policy. PSOF ¶¶ 138, 143-44.

The custom and practice in the LPD did not conform to the department's written policy. It was contrary to nationally accepted law enforcement standards. By failing to properly supervise detectives in the SIS, failing to properly vet CIs, and failing to document the work of CIs (including failing to document when a CI was terminated), the LPD allowed unreliable informants to continue working with Lowell police officers. It is well known in law enforcement that these failures lead to violations of law by informants, including entrapment and planted evidence. The LPD's failures led FA to repeatedly plant evidence, including the drugs found in both Plaintiffs' cars. PSOF ¶¶ 145-46.

## ARGUMENT

### I. Summary Judgment Standard

Summary judgment is appropriate only when there are no disputes as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The facts must be

considered in the light most favorable to the nonmoving parties, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), and all justifiable inferences must be drawn in their favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). "Where a qualified immunity defense is advanced by pretrial motion, normal summary judgment standards control." *Amsden v. Moran*, 904 F.2d 748, 752 (1st Cir. 1990) (quotation omitted). The Court should "first identify[] the version of events that best comports with the summary judgment standard and then ask[] whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." *Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009).

## II.   Defendant Lafferty Violated Mr. Santiago's Fourth Amendment Rights

Both Defendant Lafferty and the City argue that Mr. Santiago has not established a violation of his constitutional rights. Although they frame the issue differently, both Defendants claim that because officers ultimately found drugs in Mr. Santiago's car, there was probable cause to arrest him for cocaine trafficking. There are two problems with this argument—it relies on disputed facts and ignores the law about probable cause. Each issue is addressed in turn.

### A.   Lafferty's motion relies on disputed facts.

Defendant Lafferty asks this Court to consider only the facts favorable to him. He claims to have been justified in stopping Mr. Santiago's car because he observed Mr. Santiago "operating a motor vehicle in a suspicious manner" by "driving in loops." *Lafferty Mem. (Santiago)* at 8. He argues that the call from FA about Mr. Santiago's car was "simultaneous[]" to these observations and "incidental" to Lafferty's decision to follow and stop Mr. Santiago's car. *Id.* at 5. He claims Mr. Santiago committed a traffic violation and that officers found "a plethora of air fresheners" in Mr. Santiago's car. *Id.* at 8. All of these facts are disputed.

Viewed in Mr. Santiago's favor, the evidence establishes that Defendant Lafferty had not seen Mr. Santiago driving—suspiciously or otherwise—before FA called him. Not only was Mr.

Santiago not driving in "repeated loops" around Lafferty, he also never passed Defendant Lafferty's location. PSOF ¶ 80. Lafferty testified that he had a 15-second phone call with FA, who told Lafferty that "a guy" driving a "red car" was "doing some loops" near Gorham and Union Streets and "trying to sell some coke." Rather than ask any of the standard police follow-up questions, Lafferty responded, "I'll go try and pick it up." PSOF ¶ 84. Lafferty then radioed ahead a description of Mr. Santiago's car to other SIS detectives, who fabricated a traffic infraction to justify stopping and searching Mr. Santiago's car. PSOF ¶¶ 85-87.

After arresting Mr. Santiago, Defendant Lafferty prepared a false police report that concealed FA's involvement in the case. The report makes no mention of Lafferty's receiving information from an informant. Instead, Lafferty falsely wrote that he—Lafferty—had observed Mr. Santiago driving in loops, when this alleged observation had come from FA. *See Ex. 47*, *Santiago Arrest Report*; PSOF ¶ 83. Lafferty acknowledged in his deposition that it would be improper for a police officer to claim to have personally observed something that he had learned of through an informant. *Ex. 8*, *Lafferty Dep.* at 155 ("[T]hat would be lying.").

### B. The City relies on factual inferences in its own favor.

The City acknowledges that there are factual disputes about Mr. Santiago's arrest but draws inferences in its own favor. For instance, because Mr. Santiago described driving to and from a friend's house over a period of several hours before his arrest, the City suggests he effectively admits to driving loops around downtown Lowell and thus "corroborates" Lafferty's account of that evening. *City's Mem.* at 7. The City claims that this supposed admission of "suspicious activity" justifies Lafferty's instruction to the other officers to stop Mr. Santiago's car. This claim lacks merit.

In his deposition, Mr. Santiago described the night of his arrest as an evening of entirely innocuous behavior. He drove to a friend's apartment on Gorham Street around 6:30 or 7:00 p.m. to

have a drink and socialize. About an hour later, Mr. Santiago drove one of his friends home to Temple Street, then returned to the apartment on Gorham Street. The trip between Gorham Street and Temple Street did not take Mr. Santiago past Defendant Lafferty's location. PSOF ¶ 80. An hour after returning to Gorham Street, Mr. Santiago agreed to follow FA to a bar. They drove up Central Street, not past Defendant Lafferty's location at Gorham and Union Streets. At the same time, Lafferty received the 15-second phone call from FA and went to find Mr. Santiago's car on Central Street. *See Plaintiffs' Response to City's Statement of Facts* at ¶ 22; PSOF ¶¶ 83-84.

These facts do not corroborate Defendant Lafferty's version of events. The factual disputes are more substantial than which routes Mr. Santiago took. Under Plaintiffs' version of events, a jury could conclude that Defendant Lafferty fabricated the claim that he saw Mr. Santiago driving suspiciously to conceal that Mr. Santiago's arrest was based on uncorroborated information from an unreliable informant.[6]

### C.  The planted evidence did not create probable cause to arrest Mr. Santiago.

Defendants argue that the planted drugs gave Lafferty probable cause to arrest Mr. Santiago. They contend that because it is undisputed that Mr. Santiago consented to the search of his car, and that officers found drugs in his gas cap during that search, no constitutional violation stems from Mr. Santiago's arrest. This argument misses the point.

"Probable cause exists 'when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators." *Cox v. Hainey*, 391 F.3d 25, 31 (1st Cir. 2004) (quoting *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 9 (1st Cir. 2004)). The crux of the factual dispute

---

[6] Indeed, the jury may reach the same conclusion as Jack Dawley, Essex County's First Assistant District Attorney, who testified that after reading Lafferty's report he considered the circumstances of Mr. Santiago's arrest "too convenient" to be a "real world" case. PSOF ¶ 136.

here is whether Defendant Lafferty knew that FA's information was not trustworthy. This issue—which goes to the core of the probable cause analysis—can only be resolved by a jury. *See Prokey v. Watkins*, 942 F.2d 67, 73 (1st Cir. 1991) ("[I]f what the policeman knew prior to the arrest is genuinely in dispute, and if a reasonable officer's perception of probable cause would differ depending on the correct version, that factual dispute must be resolved by a fact finder."). The fact that officers found drugs in Mr. Santiago's car is the end result of Lafferty's misuse of FA. It does not change the factual dispute about whether Lafferty knew FA's information was not credible when he instructed detectives to stop Mr. Santiago's car. *See Chancellor v. City of Detroit*, 454 F. Supp. 2d 645, 655 (E.D. Mich. 2006) (rejecting same argument in case involving planted gun).

Nor does it matter that Detective Rivera instead of Defendant Lafferty stopped Mr. Santiago's car. Lafferty orchestrated the stop. Police officers cannot insulate themselves from liability by directing another officer to perform the unlawful act. *See United States v. Meade*, 110 F.3d 190, 194 n.2 (1st Cir. 1997) ("If it turns out . . . that the directing officer lacked probable cause to order the arrest, then the arrest itself is unlawful regardless of the arresting officer's otherwise proper reliance."). In any event, the facts implicitly allege misconduct by Detective Rivera. Viewing the evidence in Mr. Santiago's favor, Rivera fabricated a traffic infraction in order to justify stopping the car because Lafferty wanted it stopped.

A jury could conclude that Mr. Santiago did not drive past Lafferty's location in a suspicious manner; that he did not commit a traffic infraction; and that he did not do anything else that would have justified his being stopped by SIS detectives. On this view of the evidence, the *only* reason for stopping Mr. Santiago's car was the information Lafferty received from FA. Viewed in the light most favorable to Mr. Santiago, Lafferty violated the Fourth Amendment by directing officers to arrest Mr. Santiago without probable cause. The evidence in the record—including Lafferty's concealment

of his informant's involvement, his preparation of a false police report, his failure to corroborate FA's information, and his fabrication of the basis for a traffic stop—permits the inference that Lafferty knew of FA's misconduct. Ultimately, what Lafferty knew is a question of fact that must be resolved by a jury at trial.

## III.    Defendant Lafferty Violated Mr. Sothy's Fourth Amendment Rights

Defendant Lafferty's argument with respect to Mr. Sothy is identical in substance to the one he makes in Mr. Santiago's case.[7] Lafferty asks the Court to consider only the facts favorable to him.

The material factual dispute in Mr. Sothy's case is stark. Lafferty claims that after getting a tip from FA, he witnessed Mr. Sothy put a bag of cocaine in his gas-cap compartment and drive away. Mr. Sothy, and two witnesses, deny this. PSOF ¶ 104. On Plaintiffs' evidence, Lafferty fabricated a basis for stopping Mr. Sothy by falsely claiming to have seen Mr. Sothy put something in his gas cap. This means Lafferty unquestioningly accepted the word of FA—to the point of lying about his observations of Mr. Sothy—to make an arrest and find the drugs FA had told him would be there. This factual dispute cannot be resolved on summary judgment.

## IV.    Qualified Immunity Is Inappropriate

Defendant Lafferty is not entitled to qualified immunity in either Mr. Santiago's or Mr. Sothy's case. In evaluating a claim of qualified immunity, the Court considers "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Glik v. Cunniffe*, 655 F.3d 78, 81 (1st Cir. 2011) (quotation omitted). The second prong, in turn, requires the Court to consider "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether

---

[7] The City did not make an argument about the facts of Mr. Sothy's arrest.

in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *Stamps v. Town of Framingham*, 813 F.3d 27, 34 (1st Cir. 2016). Qualified immunity is not a defense to municipal liability. *Owens v. City of Independence, Mo.*, 445 U.S. 622, 638 (1980).

Lafferty's arguments in support of qualified immunity rely on the same disputed facts discussed above.[8] In Mr. Santiago's case, Lafferty cites his alleged "observations of specific suspicious conduct" and "a motor vehicle infraction" as a basis for following and stopping Mr. Santiago. *Lafferty Mem. (Santiago)* at 10. In Mr. Sothy's case, Lafferty repeats the claim that he "saw the plaintiff put drugs in the gas cap of his car." *Lafferty Mem. (Sothy)* at 10. The factual disputes that preclude summary judgment on the merits also preclude summary judgment on the basis of qualified immunity. *See Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009).

## V.   The City of Lowell's Custom and Practice Caused Plaintiffs' Injuries

### A.   Municipal liability standard.

In *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), the Supreme Court held that municipalities can be held liable under 42 U.S.C. § 1983 when execution of a municipal "policy or custom" causes a constitutional violation. "Policy" claims under *Monell* are fairly straightforward— courts examine whether the municipality directed its employees to do something unconstitutional. *See, e.g.*, *Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997). "Custom" claims are more complicated. "[U]nlike a 'policy,' which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up." *Baron v. Suffolk Cty. Sheriff's*

---

[8] Lafferty does not claim that Plaintiffs' constitutional rights were not clearly established. He concedes that the "right not to be subjected to criminal charges on the basis of false evidence" is clearly established. *Lafferty Mem. (Santiago)* at 9. It is, *see Limone v. Condon*, 372 F.3d 39, 45 (1st Cir. 2004), as is Plaintiffs' right to be free from arrest without probable cause. *See Wagenmann v. Adams*, 829 F.2d 196, 209 (1st Cir. 1987).

*Dep't*, 402 F.3d 225, 236 (1st Cir. 2005), *abrogated on other grounds by Jennings v. Jones*, 587 F.3d 430, 438

n.10 (1st Cir. 2009) (quotation omitted).

The First Circuit has established two requirements for proving municipal liability based on

an unofficial custom or practice. First, "the custom or practice must be attributable to the

municipality, i.e., it must be 'so well settled and widespread that the policymaking officials of the

municipality can be said to have either actual or constructive knowledge of it yet did nothing to end

the practice.'" *Miller v. Kennebec Cty.*, 219 F.3d 8, 12 (1st Cir. 2000) (quoting *Bordanaro v. McLeod*, 871

F.2d 1151, 1156 (1st Cir. 1989)). Constructive knowledge "may be evidenced by the fact that the

practices have been so widespread or flagrant that in the proper exercise of [their] official

responsibilities the [municipal policymakers] should have known of them." *Bordanaro*, 871 F.2d at

1157 (quotation omitted).

Second, "the custom must have been the cause of and 'the moving force' behind the

deprivation of constitutional rights. *Id.* The "moving force" requirement ensures that plaintiffs

"show that the municipal action was taken with the requisite degree of culpability." *Cty. Comm'rs of*

*Bryan Cty.*, 520 U.S. at 404. This requirement is satisfied by demonstrating "that the municipal action

was taken with 'deliberate indifference' as to its known or obvious consequences." *Id.* at 407

(quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Although causation and deliberate

indifference are separate requirements, they are often established through the same evidence. *Young*

*v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 26 (1st Cir. 2005).[9]

---

[9] Courts have developed shorthand phrases to describe many of the common theories of liability based on municipal inaction or acquiescence regarding unofficial customs or practices. For example, courts often refer to "failure to supervise," "failure to discipline," and "failure to train" claims. *See, e.g.*, *Blanchard v. Swaine*, C.A. No. 08–40073–FDS, 2010 WL 4922699, at *10 (D. Mass. Nov. 29, 2010). How the parties describe the claim "makes little difference in the end. At the close of the evidence, the jury will be asked to determine the question of whether the City's actions (or inactions), whatever they may have been, and whatever they are called ("policy" or "custom"), were the legal cause of [the officer's] violation of [plaintiff's]

**B.    The City of Lowell had a widespread custom of ignoring nationally accepted safeguards on the use of confidential informants.**

Defendant Lafferty's misconduct was the result of a well-settled, widespread custom or practice within the LPD. Five SIS supervisors, who collectively oversaw the unit from 2000 to 2013, testified that they did not require SIS detectives to follow the department's 1989 Informant Policy, which embodied nationally recognized standards for the use and management of confidential informants.[10] Lieutenant James Hodgdon, who ran the SIS when Defendant Lafferty began using FA as an informant in 2009, said he knew his detectives were not following departmental policy. He allowed them to operate according to "the past practice of the unit." PSOF ¶ 31(c).

All of the SIS detectives deposed in these cases testified that, before the scandal with FA and FB came to light, they were unaware that the Lowell Police Department even had a written policy on the use of informants. PSOF ¶ 29. Three of the detectives saw the policy for the first time when it was shown to them at their depositions. *Id.* The detectives testified that their knowledge of how the SIS worked with informants was acquired through "on-the-job training"—that is, learning the unit's practices from supervisors and other SIS detectives. *E.g., Ex. 15, Lavoie Dep.* at 14; *Ex. 17, Kandrotas Dep.* at 18.

These unwritten practices violated generally accepted law enforcement procedures that are designed to prevent misconduct. SIS detectives did not maintain records about each informant's reliability. They did not properly vet their informants' backgrounds. They did not document their contacts with informants or the information provided by informants. And they did not document whether this information proved to be reliable. PSOF ¶ 36. SIS detectives and supervisors thus had

---

constitutional rights." *Young v. City of Providence*, 396 F. Supp. 2d 125, 142 (D.R.I.), *aff'd in part and rev'd in part on other grounds*, 404 F.3d 4 (1st Cir. 2005).

[10] A jury would be entitled to infer that this pattern among SIS supervisors goes back further.

no record from which to determine whether and how often an informant had provided unreliable information. Even when an informant like FA was found to be unreliable, SIS officers and supervisors failed to record this information in the informant's file. This resulted in SIS detectives continuing to use unreliable informants, including FA.

Failing to document the work of SIS informants made it impossible to properly supervise detectives in the unit. The lack of documentation is not merely evidence of "administrative and managerial shortcomings," as the City claims. *City's Mem.* at 15. Informant files are an essential tool for managing, controlling, and monitoring the department's use of CIs. Without documentation, supervisors cannot review an informant's history to ensure that officers accurately describe the informant's reliability in search warrant affidavits and court testimony. It is not possible to adequately supervise a narcotics unit without proper recordkeeping. PSOF ¶ 39. The lack of documentation should have been obvious to SIS supervisors. Both ADA Krysil and ADA Dawley viewed SIS informant files during their investigations and immediately concluded that the files lacked necessary documentation. PSOF ¶¶ 38, 127, 134.

FA's history as a Lowell police informant illustrates the need for proper documentation. With proper records, SIS supervisors would have known that FA had been accused of planting evidence as early as 2003, and that the allegation was sufficiently plausible for the Superior Court to order that FA's name be disclosed. An informant who is alleged to have planted evidence cannot be considered reliable and should never again be used as an informant. The information about FA allegedly planting evidence in 2003 should have been in FA's file but was not. PSOF ¶ 49. In 2006, Sergeant Trudel independently determined that FA was unreliable, terminated FA, and concluded that SIS detectives could not use him again as an informant. PSOF ¶¶ 51-53. Had this information

28

been documented (and had anyone checked FA's file before using him, *Ex. 12*, *Hodgdon Dep.* at 50), it would have been clear that Lafferty should not use FA as an informant.

Additional evidence supports the conclusion that the SIS had a custom of disregarding obvious problems with informants. On separate occasions under the tenures of two different SIS supervisors, the LPD allowed Defendant Lafferty to continue using a CI after other SIS detectives had conducted controlled narcotics purchases from that CI. This happened with FA and, separately, with FB. PSOF ¶¶ 61-62, 71-73. In a properly run narcotics unit, the handling officer would have immediately terminated FA and FB. Lafferty testified that he did not terminate FA because FA continued to give him information. PSOF ¶ 41. This is the essence of noble cause corruption: Lafferty believed the ends justified the means. That multiple SIS supervisors allowed Lafferty to continue using FA and FB suggests Lafferty's belief was indicative of the unit's culture.

### C.      The City was deliberately indifferent to violations of constitutional rights.

The City makes three related arguments about deliberate indifference. First, it claims the City's policymaker was not on notice of the SIS's practices because there was no pattern of misconduct in which the City acquiesced. *City's Mem.* at 13. Second, the City argues that it could not have known that informants planting evidence was an obvious consequence of its inaction. *Id.* at 15-16. Third, the City claims there is no evidence that it failed to investigate or discipline its officers for their misconduct. *Id.* at 20. None of these arguments withstands scrutiny.

### i.      The City had constructive knowledge of the SIS's failure to follow the department's informant policy.

To establish notice, Plaintiffs need only show that the City's policymaker—here, the police superintendent—had constructive knowledge of the SIS's practices yet did nothing to end them. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989). Constructive knowledge "may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of

[their] official responsibilities the [municipal policymakers] should have known of them." *Id.* at 1157. The evidence here meets this standard.

The SIS's practice of neither vetting informants nor tracking their reliability dates back at least twelve years, spanning the tenure of five different SIS supervisors. Lafferty's failure to properly vet and document the work of FA and FB was not isolated; it was "the way things [were] done" in Lowell. *Kibbe v. City of Springfield*, 777 F.2d 801, 806 (1st Cir. 1985). The minimal documentation in FA's and FB's informant files was consistent with the way SIS maintained its informant files. *Ex. 29, Dawley Dep.* at 17-18; *Ex. 61, Matthews Dep.* at 93-94. Had the LPD exercised proper oversight of the SIS—which includes periodic audits and spot checks of informant files to ensure compliance with departmental policy, PSOF ¶ 18—the City would have learned of the problems within the SIS at some point during the ten or more years in which it operated this way.

The City's argument that there was no documented pattern of SIS officers using unreliable informants misses the point. The custom consists in part of the failure to document much of anything about informants within the SIS. *Cf. Baron v. Suffolk Cty. Sheriff's Dep't*, 402 F.3d 225, 238 (1st Cir. 2005), *abrogated on other grounds by Jennings v. Jones*, 587 F.3d 430, 438 n.10 (1st Cir. 2009) (where alleged custom involves failure to document misconduct, making it "extremely difficult to substantiate any allegations" about the custom, testimony from officers "is all the more significant"). For example, the 1989 Informant Policy required written documentation when a CI was terminated, but the SIS did not follow this procedure. The lack of documentation over many years should have alerted the Lowell police command staff to problems within the SIS, but Captain Webb never checked whether the SIS was following department policy. From this evidence, a jury "might reasonably conclude that the LPD was not taking steps to ensure that it was informed of problems

as they arose, and thus could not implement appropriate training and discipline in response."

*Blanchard v. Swaine*, C.A. No. 08–40073–FDS, 2010 WL 4922699, at *11 (D. Mass. Nov. 29, 1010).

### ii.     Planted evidence is a known and obvious consequence of allowing detectives to use unreliable informants.

Confidential informant policies are designed to prevent the type of misconduct that occurred here. *Ex. 1*, *Drago Report* at 14; *Ex. 3*, *1989 Informant Policy* at 10. There is an expectation among police officers that some informants will prove to be unreliable or untrustworthy. By requiring strict controls and thorough documentation, informant policies are designed to detect unreliable informants before they cause harm to the department or others. These policies are also designed to ensure that narcotics detectives adhere to constitutional requirements when using informants. Indeed, the LPD's 1989 Informant Policy was enacted as a response to police misconduct involving the use of informants. PSOF ¶ 24; *Commonwealth v. Lewin*, 405 Mass. 566 (1989). The policy says "All members of this department shall be responsible for strict compliance with all procedures established by this directive." *Ex. 3*, *1989 Informant Policy* at 10. Despite its awareness of the importance of following this policy, the City allowed its narcotics detectives and supervisors to ignore the policy for years.

As a result, informant misconduct—including planting evidence—was "bound to happen, sooner or later." *Bordanaro,* 871 F.2d at 1157; *see also Ex. 2, Drago Dep.* at 246-47 ("this type of failure to follow the procedures" consistently leads to informant misconduct such as planting evidence and entrapment). FA had been accused of planting evidence in the past. Allowing him to continue working as an SIS informant created an obvious risk that he would plant evidence again. *Ex. 1, Drago Report* at 13-14. Sergeant Trudel later terminated FA due to unreliability, concluding that he must not be used as an SIS informant again. The 1989 Informant Policy requires that a memorandum about this termination be placed in the informant's file, but Sergeant Trudel,

31

consistent with SIS practice, did not document this critical information. The absence of documentation about FA's unreliability led to Lafferty's being allowed to use FA when a new supervisor took over the unit. Even after Lafferty became aware that FA was actively selling drugs while working as an informant, Lafferty continued to use FA because FA helped Lafferty "make cases." PSOF ¶ 41. In other words, Lafferty let FA continue his criminal enterprise in exchange for information. It was only a matter of time until FA began planting evidence to maintain his police protection.

### iii.        The City never investigated the informant scandal.

The City's failure to conduct an internal investigation after the criminal investigation ended is further evidence of the City's desire to insulate its policymakers from learning about problems in the LPD. Superintendent Friedl's deposition testimony reveals a level of ignorance indicative of a willful disregard of facts that might reveal systemic problems within the SIS: even after the DA's investigation, Superintendent Friedl still believed the SIS had been following the 1989 Informant Policy. PSOF ¶ 144. This indifference to potential wrongdoing is of a piece with the SIS supervisors' lack of concern that detectives were violating the department's CI policy for more than a decade. *See Ex. 1*, *Drago Report* at 16. The LPD's failure to investigate despite the seriousness of the allegations—resulting in the dismissal of 16 criminal cases and vacating two criminal convictions—is evidence of the City's indifference to the customs and practices in the SIS. *See Bordanaro*, 871 F.2d at 1166-67; *Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir. 1991).

The City's claim that it relied on the Essex County District Attorney's investigation is disputed, PSOF ¶ 130, and beside the point. The DA's office conducted a criminal investigation targeting FA and FB; it did not investigate whether Lowell police officers had violated department policy. The City knew this. Superintendent Friedl instructed officers not to suggest that the DA was

investigating Defendant Lafferty or other SIS officers. Friedl told officers they were to describe the investigation as focusing only on possible misconduct by the informants. PSOF ¶ 133. When the DA's office completed its investigation, Superintendent Friedl agreed that the LPD would receive no documentation about the DA's findings or the basis for those findings. PSOF ¶ 138. This is a textbook illustration of a policymaker insulating herself from evidence of potential wrongdoing. Even today, the City of Lowell has no documentation about the widespread problems within the SIS that led to Lafferty's use of FA and FB.

**D.     The City's custom and practice caused the violations of Plaintiffs' Fourth Amendment rights.**

Establishing causation requires evidence of "some 'affirmative link' between the municipal custom and the constitutional deprivation." *Bordanaro v. McLeod*, 871 F.2d 1151, 1157 (1st Cir. 1989) (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824-25 & n.8 (1985)). Evidence that officers were "following regular police practice" when they violated a plaintiff's constitutional rights is sufficient to establish the required nexus. *Id.* at 1158; *see also Kibbe v. City of Springfield*, 777 F.2d 801, 805-06 (1st Cir. 1985) (evidence of "widespread activity" consistent with custom "contributes toward proof of the fault and causation elements of the city's liability"). Causation is ordinarily a question of fact for the jury. *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 23 (1st Cir. 2005); *see also Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990) ("As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury.").

The evidence in the record establishes causation in two ways. First, that Defendant Lafferty was permitted to use FA as an informant is a direct consequence of the City's custom of failing to document the use of informants. Had the SIS followed its 1989 Informant Policy, there would have been information in FA's file that FA was alleged to have planted evidence in 2003, and that his

33

name had been disclosed in *Commonwealth v. Collins* in connection with that allegation. FA's file also would have contained documentation of Sergeant Trudel's determination that FA was unreliable and not to be used as an SIS informant. Further, Defendant Lafferty would have been required to check FA's criminal history before using him. Had he done so, Lafferty would have learned that FA had been arrested for drug trafficking and was still on probation for cocaine distribution. If the SIS had followed the 1989 Informant Policy or operated in accordance with nationally accepted standards designed to prevent violations of the Constitution, Defendant Lafferty would never have been permitted to use FA as an informant at all.

Second, the practices within the SIS allowed Defendant Lafferty to develop a mindset that the ends justify the means. Lafferty felt it was acceptable to use FA as an informant even though he suspected FA was a drug dealer. SIS supervisors did not correct Lafferty; they allowed Lafferty to continue using FA and FB as CIs even after other detectives conducted controlled narcotics purchases from them. In a properly run narcotics unit, FA and FB would have been immediately terminated as informants, long before they planted evidence on Mr. Santiago, Mr. Sothy, and others.

The custom and practice within the SIS sent the message to Defendant Lafferty that it was acceptable to cut corners to make arrests. Lafferty showed that he had adopted this view by arresting people—including Mr. Santiago and Mr. Sothy—with minimal corroboration despite his suspicion that some cases based on FA's information seemed "too easy." *Ex. 9*, *Lafferty Dep. II* at 48. This behavior cannot exist in isolation; it flows from a policing mindset that is allowed to develop over time. Noble cause corruption begins with seemingly minor transgressions and expands over time into major violations, like filing false police reports in order to make a charge stick. *See Ex. 2*, *Drago Dep.* at 160-61. It is essential that supervisors correct small problems before they grow into large ones. This did not happen in the SIS because supervisors did not require detectives to follow the

written policy meant to prevent such corruption and safeguard constitutional rights. As a result, Detective Lafferty believed his use of unreliable informants was acceptable because it helped him make arrests. The customs and practices of the City of Lowell led directly to this noble cause corruption and to the violation of Plaintiffs' rights.

## CONCLUSION

For the reasons set forth above, this Court should deny Defendant City of Lowell's Motion for Summary Judgment [*Santiago* ECF #157], Defendant Thomas Lafferty's Motion for Summary Judgment regarding Plaintiff Santiago [*Santiago* ECF #153], and Defendant Thomas Lafferty's Motion for Summary Judgment regarding Plaintiff Sothy [*Sothy* ECF #68] in their entirety.

RESPECTFULLY SUBMITTED,
For the Plaintiffs,
By his attorneys,

/s/ Drew Glassroth
Howard Friedman, BBO #180080
Drew Glassroth, BBO #681725
**Law Offices of Howard Friedman, PC**
90 Canal Street, Fifth Floor
Boston, MA 02114-2022
(617) 742-4100
hfriedman@civil-rights-law.com
dglassroth@civil-rights-law.com

Dated: July 5, 2016

## CERTIFICATE OF SERVICE

I certify that on this day I caused a true copy of the above document to be served upon the attorney of record for all parties via CM/ECF.

Date: July 5, 2016        /s/ Drew Glassroth
                          Drew Glassroth