UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JONATHAN SANTIAGO, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 13-12172-IT |
| | * | |
| THOMAS LAFFERTY and CITY OF | * | |
| LOWELL, | * | |
| | * | |
| Defendants. | * | |

| | | |
|---|---|---|
| NEL SOTHY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 13-12302-IT |
| | * | |
| THOMAS LAFFERTY and CITY OF | * | |
| LOWELL, | * | |
| | * | |
| Defendants. | * | |

| | | |
|---|---|---|
| MIHRAN MOSKO, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 15-12159-IT |
| | * | |
| THOMAS LAFFERTY, BARRY | * | |
| GOLNER, and CITY OF LOWELL, | * | |
| | * | |
| Defendants. | * | |

<u>MEMORANDUM AND ORDER</u>

March 31, 2017

Plaintiffs Jonathan Santiago, Nel Sothy and Mihran Mosko bring claims against

Defendants City of Lowell and Thomas Lafferty of the Lowell Police Department, alleging

Defendants' police practices deprived Plaintiffs of constitutional rights in violation of 42 U.S.C.

1

§ 1983, and related claims against Defendant Lafferty under state law. Plaintiff Mosko also brings claims under § 1983 against Barry Golner of the Lowell Police Department.

The three cases were consolidated for purposes of discovery. Santiago v. Lafferty et al., C.A. No. 13-12172 [#22]; Mosko v. Lafferty et al., C.A. No. 15-12159 [#31]. The City of Lowell filed a single motion for summary judgment in Santiago v. Lafferty et al., C.A. No. 13-12172 [#157], as to the claims of both Plaintiffs Santiago and Sothy, and a separate motion for summary judgment in Mosko v. Lafferty et al., C.A. No. 15-12159 [#51]. Defendant Thomas Lafferty filed separate motions for summary judgment in each of the three actions. Santiago v. Lafferty et al., C.A. No. 13-12172 [#153]; Sothy v. Lafferty et al., C.A. No. 13-12302 [#68]; Mosko v. Lafferty et al., C.A. No. 15-12159 [#57]. Defendant Golner moved for summary judgment in Mosko v. Lafferty et al., C.A. No. 15-12159 [#53].

Plaintiffs Santiago and Sothy filed in Santiago v. Lafferty et al., C.A. No. 13-12172, a single opposition [#173] in response to the three motions filed on that docket and in Sothy v. Lafferty, C.A. No. 13-12302. Plaintiff Mosko filed in Mosko v. Lafferty et al., C.A. No. 15-12159, two oppositions [#68, #69] in response to the three motions there. With leave of court [#65], Plaintiff Mosko incorporated by reference Plaintiffs' exhibits filed in opposition to summary judgment in Santiago v. Lafferty et al., C.A. No. 13-12172, and Sothy v. Lafferty, C.A. No. 13-12302.

The court held a consolidated hearing on the six motions and now issues this consolidated order denying summary judgment as to Defendants Lafferty and the City of Lowell and granting summary judgment as to Defendant Golner.

A.  The Summary Judgment Standard

In resolving a motion for summary judgment, the court takes all properly supported evidence in the light most favorable to the non-movant and draws all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it has the potential of determining the outcome of the litigation." Patco Constr. Co. v. People's United Bank, 684 F.3d 197, 206-07 (1st Cir. 2012) (internal quotation marks and citations omitted).

B.  Factual Record

Resolving factual disputes and drawing inferences in the light most favorable to the Plaintiffs (as required on summary judgment), a jury could reasonably find as follows from the record evidence:

1.  *The Lowell Police Department's Special Investigation Section's Use of Confidential Informants*

The Lowell Police Department operates a specialized unit known as the Special Investigations Section ("SIS") dedicated to combating "vice crimes," with particular focus on narcotics investigation. As part of this work, SIS detectives often use confidential informants to obtain information.

SIS's policies are ultimately the responsibility of Lowell's Superintendent of Police. The official policy governing SIS's use of confidential informants was the "1989 Informant Policy," enacted at a time when the use of confidential informants, and their abuse, was national news. As a means of protecting against problems inherent to the use of confidential informants, that policy

required that officers run background checks and maintain a documentation system whereby information from confidential informants could be kept, and their reliability checked and reviewed. Several SIS officers—including Defendant Lafferty who worked in SIS from 2005 to 2013—were unaware of this written policy, and only became aware as the events giving rise to this litigation began to unfurl. Superintendent Kenneth Lavallee—who was Superintendent from December 2006 to March 2013—was aware as early as 2009 that officers complained about lack of access to the policy.

The policy as written was not enforced. Several SIS officers testified to persistent non-adherence to the policy, which (although the granular facts are in dispute) consisted largely of systematic failure to document the use of confidential informants, systematic failure to vet confidential informants, and systematically inattentive supervision of officers using confidential informants.

### 2. *The Confidential Informant Pseudonymously Known as FA*

FA was a drug dealer from whom officers had executed controlled buys. He began informing for SIS between 2001 and 2002. There is no evidence in FA's informant file or in the record here that FA was vetted prior to his engagement with SIS. Detective William Samaras was FA's control officer from 2002 through 2005.

In 2003, FA was involved in the arrest of a man for cocaine found in the man's car. The man claimed that the cocaine had been planted. The trial resulted in a hung jury and thereafter FA's name was divulged and the cocaine was tested for purity. The cocaine's purity turned out to be low, which in the prosecutor's opinion lent credibility to the claim that the drugs had been planted.

In both 2004 and 2005, FA was arrested for felony distribution of counterfeit goods and for felony cocaine trafficking. At around the time of this second arrest, Sergeant James Trudel learned of FA's involvement with another police department and deemed FA unreliable for any future use by SIS. Samaras Dep. 64, Santiago v. Lafferty et al., C.A. No. 13-12172 [#175-21]. This decision was not documented in FA's file or on the SIS computer's informant spreadsheet.

In 2006, FA attempted to work with Assistant District Attorney Thomas O'Reilly. It appeared to ADA O'Reilly that FA had lied during his proffer and had arranged for misinformation to be supplied to the police. O'Reilly Dep. 16, Santiago v. Lafferty et al., C.A. No. 13-12172 [#175-31]. ADA O'Reilly determined that FA was unreliable and did not work with him.

In December 2008, FA was arrested for assaulting a Lowell police officer. At the time, FA had pending charges for cocaine trafficking and was on probation for cocaine distribution. FA's attorney contacted Defendant Lafferty to work out a deal, touting FA's prior work with SIS. Defendant Lafferty did not vet FA's background, did not check FA's criminal history and did not contact FA's prior control officer, Detective Samaras, to learn about FA's past performance as a confidential informant. Lafferty Dep. 50-54, Santiago v. Lafferty et al., C.A. No. 13-12172 [#175-8].

Defendant Lafferty asked his supervising officer, Lieutenant Hodgdon, for permission to use FA, telling him that FA's attorney says that FA can do some really good work. Defendant Lafferty also stated that SIS had used him in the past and that FA was reliable. Lieutenant Hodgdon saw no documentation in FA's file indicating he could not be used.

Lieutenant Hodgdon instructed Defendant Lafferty to speak with ADA O'Reilly for his approval of using FA and allowing him to try to work off the charges he had pending against

him. Hodgdon Dep. 48, <u>Santiago v. Lafferty et al.</u>, C.A. No. 13-12172 [#175-12]. Defendant

Lafferty claims to have secured permission from ADA O'Reilly, but ADA O'Reilly does not

recall any such conversation and states that he would have not permitted FA's further use.

Lieutenant Hodgdon anticipated that FA would be vetted again before he was used to make sure

he would be reliable through surveillance, and if need be, controlled buys. <u>Id.</u> at 56. The record

includes no evidence of such vetting taking place.

Between June and August 2009, FA was the target of an investigation conducted by other

SIS officers, and these officers, using another confidential informant, executed two controlled

buys from FA. The officers' supervisor (presumably Lieutenant Hodgdon) was advised that FA

was a target. Lally Dep. 11, 49, <u>Santiago v. Lafferty et al.</u>, C.A. No. 13-12172 [#175-16].

Defendant Lafferty nonetheless continued to use FA. Although Defendant Lafferty has

testified inconsistently about the frequency of his use of FA, other officers confirmed that

Defendant Lafferty and FA were frequently involved in investigations together. Defendant

Lafferty has also testified inconsistently about the quality of FA's tips.

FA was involved with all three Plaintiffs' arrests.

### 3.   The Confidential Informant Pseudonymously Known as FB

FB was referred to Defendant Lafferty by FA. Defendant Lafferty met with FB, asked

him what he could do, signed paperwork and obtained a copy of FB's criminal history and photo

identification. Documents in FB's file, however, show the same name but different birthdates for

FB. FB began informing for SIS in March 2010.

In December 2010, another SIS detective began investigating FB for drug dealing, and

using another confidential informant, conducted three controlled purchases of cocaine from FB,

and obtained a search warrant for FB's home. Defendant Golner advised the other detective

during the execution of the search warrant that FB was Defendant Lafferty's informant. Despite

the controlled buys, Defendant Lafferty continued to use FB as an informant.

FB was involved in Plaintiff Mosko's arrest.

### 4.   The Investigatory Stops, Searches and Arrests

#### i.   Plaintiff Santiago

On February 21, 2012, Plaintiff Santiago spent the evening with friends. He encountered

FA outside his friend's house. FA invited Plaintiff Santiago into an apartment in the same

complex and also invited him to go out to a local bar. When Plaintiff Santiago returned from the

apartment to his car, an associate of FA's (later identified as another of Defendant Lafferty's

informants) was sitting in Plaintiff Santiago's car. After the associate got out, Plaintiff Santiago

drove away. Plaintiff Santiago returned later, and he and FA then agreed to go to the bar.

Plaintiff Santiago offered FA a ride, but FA insisted they take separate cars.

Defendant Lafferty was stationed at or around Gorham Street at the intersection with

Union Street. Defendant Lafferty testified to having seen Plaintiff Santiago's car pass Defendant

Lafferty's vantage point twice, but Plaintiff Santiago denies the logistical possibility of this.

Regardless, it is undisputed that Defendant Lafferty was in a stationary position when he

purportedly saw Plaintiff Santiago's car and that he did not follow the car before receiving a call

from FA.

Before Plaintiff Santiago reached the bar, FA called Defendant Lafferty. Defendant

Lafferty reports that FA told him that some guy driving a red car was "doing some loops" near

Gorham and Union Streets and was "trying to sell some coke." The call lasted 15 seconds and

Defendant Lafferty asked FA no questions about the basis for his knowledge. Defendant Lafferty

ran Plaintiff Santiago's plates, and radioed Detective David Lavoie and Detective Rivera,

instructing them to follow Plaintiff Santiago. Lafferty Dep. 128-30, <u>Santiago v. Lafferty et al.</u>, C.A. No. 13-12172 [#175-8]. Detective Lavoie learned from Defendant Lafferty before stopping the car that an informant had stated that there were narcotics in this car. Lavoie Dep. 63, <u>Santiago v. Lafferty et al.</u>, C.A. No. 13-12172 [#175-15].

Detective Rivera and Detective Lavoie pulled Plaintiff Santiago over in a school zone for purportedly crossing the double yellow line -- a traffic violation Plaintiff Santiago denies. Plaintiff Santiago consented to a search of the car. A canine called to the scene alerted to the car's gas cap, where officers found cocaine. Plaintiff Santiago denied ownership, but was nonetheless arrested.

Defendant Lafferty's police report omitted FA's involvement in the matter, and claimed that Defendant Lafferty had radioed the other officers because Plaintiff Santiago's car passed him repeatedly. The police report claims further that the officers themselves had "followed the vehicle as it made repeated loops around the Gorham St, Union St, and back to the Central St area." Santiago Arrest Report 2, <u>Santiago v. Lafferty et al.</u>, C.A. No. 13-12172 [#175-47]. Plaintiff Santiago was charged with an erroneously-high weight of cocaine. Defendant Lafferty did not conduct any follow-up investigation to determine if Plaintiff Santiago was in fact a drug dealer or was connected to any other drug activity in Lowell. The day after the arrest, FA contacted Defendant Lafferty about the arrest, and Defendant Lafferty did not question FA as to why he was contacting him. Ultimately, the cocaine seized during this arrest was tested for purity, which was determined to be low.

ii.  Plaintiff Sothy

On August 1, 2012, Plaintiff Sothy and FA were at the same club. Plaintiff Sothy encountered FA in the club's bathroom conducting a drug transaction. FA offered to sell Plaintiff

Sothy cocaine but he declined. Plaintiff Sothy left the club and when he returned, he parked his Toyota Scion directly in front of the entrance to the club in a spot FA liked to use.

Defendant Lafferty reports that that same evening, FA spoke to him and stated that an Asian male who drives a Scion was inside the club trying to sell cocaine, prompting Defendant Lafferty to set up surveillance at the club.

Plaintiff Sothy next left the club with three others. After Plaintiff Sothy and the three others got into his car, he drove to a nearby restaurant. Defendant Lafferty later claimed that Plaintiff Sothy had walked out of the club by himself, leaned into the car to pop a latch for the gas cap, looked up and down the street, walked to the rear where the gas cap was, pulled something out of his pocket that appeared to be a plastic bag, put it in the gas compartment, shut the cap, and then sat in the car idling for several minutes before the others joined him. Lafferty Dep. 153-55, Santiago v. Lafferty et al., C.A. No. 13-12172 [#175-8].

Defendant Lafferty and other SIS officers followed Plaintiff Sothy's car and, when the car stopped, ordered the occupants of the car out at gunpoint. Defendant Lafferty and other officers searched the car without Plaintiff Sothy's consent. Defendant Lafferty tried to open the gas cap area without releasing the latch (despite purportedly having seen Plaintiff Sothy lean into the car to release the latch) but could not. Lafferty Dep. 153, 158, Santiago v. Lafferty et al., C.A. No. 13-12172 [#175-8]. Plaintiff Sothy told Detective Lafferty that one had to reach in the car to unlatch it, which Sergeant Noone then did, and a plastic bag with cocaine tumbled out of the gas cap area. Id. at 157-58. Immediately prior to the search of the gas cap, Plaintiff Sothy asserted nothing was in there, and immediately after the cocaine was found in the gas cap, he denied any ownership of it. He and other passengers accused officers of planting the drugs.

Plaintiff Sothy was arrested, booked and charged with possession of an erroneously-high weight of cocaine. Defendant Lafferty's report claimed (contrary to Plaintiff Sothy's assertions) that Defendant Lafferty observed Plaintiff Sothy place a plastic bag in the gas cap area before leaving the club, and it made no mention of a call from FA that evening asserting that Plaintiff Sothy was inside the club. Sothy Arrest Report 2, Santiago v. Lafferty et al., C.A. No. 13-12172 [#175-53].

The cocaine's purity was tested and found too low to be quantified.

### iii.   Plaintiff Mosko

In the week proceeding August 27, 2012, FA and FB informed Defendant Lafferty that a man known as Mike matching Plaintiff Mosko's description was selling cocaine out of Plaintiff Mosko's home. FA also informed Defendant Lafferty that Mike's recently-purchased minivan was usually parked outside of that residence. Officers observed Plaintiff Mosko's residence but saw no suspicious activity. There is no evidence in the record that Defendant Lafferty attempted to arrange a controlled buy from Plaintiff Mosko.

Plaintiff Mosko had a "for sale" sign on the minivan parked outside his home. At approximately 9:00 p.m. on August 27, an unknown person came to Plaintiff Mosko's house inquiring about the van. This person took the van on a test drive with Plaintiff Mosko's son sitting in the passenger seat. Mosko Dep. 46, Mosko v. Lafferty et al., C.A. No. 15-12159 [#52-8]. On their return, they parked the van in the same spot. A second person called Plaintiff Mosko twice that evening inquiring into the van, raising Plaintiff Mosko's suspicion and prompting him to remove the dealer plate from the rear of the van. At approximately 9:30 p.m., FA informed Defendant Lafferty that the man FA had identified earlier was storing a large amount of cocaine

under the driver's seat of his van in preparation for a sale. SIS officers—including Defendants Lafferty and Golner—set up surveillance of Plaintiff Mosko's home from different locations.

At some point, the person who had test-driven the van returned to the residence. Plaintiff Mosko went out to see him, but did not go near the driver's side of the van then or at any other point during the night of his arrest.

Defendant Lafferty did not have a good view of the area, Lafferty Dep. 19, Mosko v. Lafferty et al., C.A. No. 15-12159 [#52-14], but Detective Lavoie, who had the closest vantage point, recalls seeing Plaintiff Mosko on the front porch. Lavoie Dep. 23-24, Mosko v. Lafferty et al., C.A. No. 15-12159 [#70-3]. He also recalled that the van was parked with the driver's side closest to the building, but does not recall seeing anyone approach or enter the van. Lavoie Dep. 23-24, Mosko v. Lafferty et al., C.A. No. 15-12159 [#70-3].

After Defendant Lafferty stated to the others that he had been recognized and that surveillance had been compromised, Defendant Golner approved SIS approaching Plaintiff Mosko's home. A tenant of Plaintiff Mosko's home allowed Defendant Golner and other SIS officers into home, where officers kicked in Plaintiff Mosko's bedroom/basement door. Mosko Dep. 60, Mosko v. Lafferty et al., C.A. No. 15-12159 [#70-12].

Without Plaintiff Mosko's permission but with Defendant Golner's assent, Defendant Lafferty searched the unlocked van looking for cocaine. Lafferty Dep. 27, Mosko v. Lafferty et al., C.A. No. 15-12159 [#52-14]. He checked right under the driver's seat and found the cocaine as FA said he would. Id. Plaintiff Mosko denied ownership of the cocaine, but was arrested and charged with trafficking cocaine of 100 grams or more in a school/park zone. Mosko Dep. 67, Mosko v. Lafferty et al., C.A. No. 15-12159 [#70-12]; see also Mosko Arrest Report 3, Mosko v.

Lafferty et al., C.A. No. 15-12159 [#70-7] (stating that after being placed under arrest, Plaintiff Mosko repeatedly stated that he was a "user and not a dealer").

Defendant Lafferty completed a tow report which checked off "arrest" and "forfeiture" as reasons for the tow. He did not check "unreg m/v" or "parking violation" as reasons, or additional reasons, for the tow. Lowell Police Dep't Tow Report, Mosko v. Lafferty et al., C.A. No. 15-12159 [#70-8].

Defendant Lafferty wrote in his arrest report that the informants had assisted SIS in the past with controlled purchases of narcotics,[1] and that he searched the interior of the van "based on the precise information we had received from [one of the informants] that Mike had stored a large amount of cocaine underneath the drivers side of the vehicle . . . ." Mosko Arrest Report 3, Mosko v. Lafferty et al., C.A. No. 15-12159 [#70-7]. The report noted that Detective Lavoie "saw a white male repeatedly exiting and re-entering the front entry door" of the residence, but then continued, using the passive voice, to assert that "[d]uring this surveillance the white male was seen entering the mini van and bending over as if to be manipulating something under the drivers seat." Mosko Arrest Report 3, Mosko v. Lafferty et al., C.A. No. 15-12159 [#70-7]. No testimony has been proffered on summary judgment to support those final statements.

Defendant Golner later filed a supplemental report adding facts he had "forgot[ten] that evening," namely that Plaintiff Mosko's van was without plates, unregistered, and parked "partially on the sidewalk and on the public roadway." Supplemental Arrest Report 1, Mosko v. Lafferty et al., C.A. No. 15-12159 [#70-7]. Defendant Golner made sure his supplement "made it to the court before the reports were forwarded to the district attorney's office and the prosecution." Golner Dep. 25-26, Mosko v. Lafferty et al., C.A. No. 15-12159 [#70-4].

---

[1] The record contains no evidence of their assistance with controlled purchases of narcotics.

Defendant Golner further testified that although the "reason" for the search was not to conduct inventory, he believed the officers were nonetheless permitted to search the van as an inventory search because it was unregistered. Id. at 23.

Plaintiff Mosko was held for approximately three months. Mosko Complaint ¶52, Mosko v. Lafferty et al., C.A. No. 15-12159 [#1]. The cocaine tested for only 6% purity. NMS Lab Report 2, Santiago v. Lafferty et al., C.A. No. 13-12172 [#175-60].

### 5. The Investigation

On October 10, 2012, FB met with Massachusetts State Police and informed them that FA was a large scale drug dealer, that he was planting drugs on people, and that he was working as a confidential informant for the Lowell Police Department. In November 2012, FB again met with the Massachusetts State Police and informed them that he had helped FA on several occasions and that both FA and FB were confidential informants for the Lowell Police Department. Among six cases FB described, two strongly resembled Plaintiff Santiago's and Plaintiff Sothy's arrests. Upon being notified by Massachusetts State Police, Middlesex County Assistant District Attorney Cara Krysil began to investigate the scope of potentially affected cases. ADA Krysil recognized FA's name, having prosecuted a case in which FA was involved and was accused of planting evidence. In the course of ADA Krysil's investigation, she concluded that a series of "gas cap" cases "weren't actual cases. They weren't –the driver wasn't the one storing the drugs in the gap cap." Krysil Dep. 37, Santiago v. Lafferty et al., C.A. No. 13-12172 [#175-28].

The investigation was turned over to the Essex County District Attorney, where Assistant District Attorney John Dawley took over. During the course of ADA Dawley's investigation, he requested relevant SIS documents from Captain Thomas Kennedy, who in turn drafted the

request as referencing an investigation of Defendant Lafferty. Superintendent Friedl instructed that language be changed to describe the investigation as targeting the informants, but not Defendant Lafferty.

ADA Dawley concluded that several of the cases involving FA, including a case with facts nearly identical to Plaintiff Santiago's, seemed "too convenient." He ultimately concluded there was insufficient evidence to bring criminal charges against FA or FB, but noted that SIS had failed to adhere to officially-promulgated policies concerning the use of confidential informants.

### 6. *The Dismissals*

The Commonwealth entered *nolle prosequi* as to Plaintiff Mosko on February 11, 2013, Plaintiff Santiago on March 6, 2013, and Plaintiff Sothy on March 22, 2013. In total, at least sixteen pending cases were dismissed and two convictions vacated as a result of this investigation.

### C. Discussion

### 1. *Plaintiffs' Claims Against Defendant Lafferty*

Section 1983 provides the primary and often sole federal remedy to victims of unconstitutional state action. Plaintiffs avail themselves of the remedy via a dual demonstration: that the state actor "acted under color of state law," and through that action "deprived the plaintiff of rights secured by the Constitution or by federal law." Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008).

Defendant Lafferty does not dispute that if he knew of or countenanced evidence fabrication, Plaintiffs would be able to state a constitutional violation against him. See Lafferty

Memo. Supp. Mot. Summ. J. 8, <u>Santiago v. Lafferty et al.</u>, C.A. No. 13-12172 [#154].[2]

Defendants argue that the record does not support a finding that Defendant Lafferty affirmatively

knew of any such fabrications. As explained below, Defendants' argument as to the factual

record will ultimately be for the jury. But even as to the legal standard, Defendants may overstate

Plaintiffs' burdens.

      The First Circuit has noted that reckless disregard for truth in determining probable cause

suffices to prove a constitutional violation. <u>See</u> <u>Martinez-Rodriguez v. Guevara</u>, 597 F.3d 414,

420 (1st Cir. 2010) (it is "beyond peradventure that arrests procured on the basis of material false

statements or testimony given in reckless disregard for the truth violate the Fourth

Amendment."); <u>Burke v. Town of Walpole</u>, 405 F.3d 66, 81-85 (1st Cir. 2005) (officers violate

Fourth Amendment rights in procuring warrant via "intentional or reckless" misrepresentations

to a magistrate).

      Further, while informants' tips "comprise an important weapon in the armamentarium of

law enforcement, their use entails a risk that police action may be predicated on malicious or

unfounded reports." <u>United States v. Brown</u>, 500 F.3d 48, 54 (1st Cir. 2007). Thus the First

Circuit lists as non-exhaustive factors to be considered: an informant's "veracity" and "basis of

knowledge"; whether the informant is relaying "firsthand knowledge"; whether the tip is

corroborated when reasonable and practicable; the professional assessment by an officer,

informed by his experience and expertise, of the probable significance of the informant's

information; the past relationship between the officer and the confidential informant (disfavoring

---

[2] This point is axiomatic. <u>See</u> <u>Limone v. Condon</u>, 372 F.3d 39, 44-45 (1st Cir. 2004) ("[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.").

anonymity); and whether the informant has previously and consistently provided accurate and precise information leading to arrests. United States v. Tiem Trinh, 665 F.3d 1, 10-11 (1st Cir. 2011) (elucidating these factors in context of an officer's relaying a confidential informant's tip in a search warrant affidavit); Brown, 500 F.3d at 54. These factors apply seamlessly in the warrantless arrest context. See United States v. Fiasconaro, 315 F.3d 28, 34-35 (1st Cir. 2002).

And while the courts have recognized that "those who possess information about the inner workings of the drug trade are unlikely to be persons of impeccable moral integrity," the law still requires that, "when all the pertinent considerations are weighed, the information reasonably appears to be reliable," and that police must thus act "'with due diligence to reduce the risk of a mendacious or misguided informant.'" Brown, 500 F.3d at 55-56; see United States v. Winchenbach, 197 F.3d 548, 556 (1st Cir. 1999). Accordingly, Defendant Lafferty cannot rely on confidential informants simply because he does not know for sure that drugs are being planted. Instead, he was required, at minimum, to determine that the information provided by FA and FB reasonably appeared to be reliable after weighing all pertinent considerations.

Here, Plaintiffs' evidence, if believed by a jury, may show Defendant Lafferty's reckless indifference to evidence planting, or at least a wholesale failure to weigh the reliability of the information provided to him. The record shows a jury may be presented with the following examples of evidence which it may reasonably credit:

- FA had been accused of planting evidence before Plaintiffs' arrests, possibly on multiple occasions;

- FA had been terminated as an informant for lack of reliability by SIS officers before Plaintiffs' arrests;

- Defendant Lafferty represented FA's reliability to Lieutenant Hodgdon, stating that SIS had used him in the past, and that FA was reliable, despite Defendant Lafferty not vetting FA's background, not checking FA's criminal history and not contacting FA's prior control officer, Detective Samaras, to learn about FA's past performance as a confidential informant;

- Defendant Lafferty claims to have received ADA O'Reilly's approval to use FA, while ADA O'Reilly could not remember giving such permission and states that he would not have done so;

- Both FA and FB were caught selling drugs while informants several times during the time they worked for Defendant Lafferty;

- Defendant Lafferty made no inquiry into the basis for FA's knowledge when he received FA's tips in these three cases;

- Defendant Lafferty took no steps before the arrests to corroborate FA's allegations, such as arranging a controlled buy;

- Defendant Lafferty omitted FA's involvement in Plaintiff Santiago's arrest report and, if Plaintiffs are believed rather than Defendant Lafferty, lied about his personal observations or exaggerated his colleagues' observations in the arrest reports;

- Defendant Lafferty made no inquiries after the arrests as to the purity of the cocaine, even where the arrests seemed too easy or were suspect (such as the "gas cap" cases);

- Defendant Lafferty testified inconsistently about the frequency and quality of FA's tips.

From these and similar facts in the record, if Plaintiffs are believed, a reasonable jury may infer that Defendant Lafferty was not merely negligent in his use of FA and FB in Plaintiffs' arrests (which appears an incontestable point), but in fact turned a blind eye to what may very

well have been the informants' planting of evidence and, in any event, failed to make any

determination that the information provided by FA and FB had any indicia of reliability (other

than the presence of drugs *where they could have been planted*). Of course, a jury may not so

conclude. But at this juncture, the record is such that a jury is entitled to draw its own

conclusions, precluding summary judgment.

In Plaintiff Mosko's case, Defendant Lafferty seeks to justify the search of the van under

the "inventory search" exception to the Fourth Amendment's presumption that warrantless

searches are unreasonable. The "inventory search" doctrine permits warrantless searches of

vehicles if "carried out pursuant to a standardized inventory policy," whether written or

unwritten. See United States v. Hawkins, 279 F.3d 83, 85-86 (1st Cir. 2002). Its purpose is

"totally divorced from the detection, investigation, or acquisition of evidence relating to the

violation of a criminal statute." See Colorado v. Bertine, 479 U.S. 367, 381 (1987) (quoting

Cady v. Dombrowski, 413 U.S. 433, 441 (1973)). That is, the inventory search exception's risks

are tolerated only because "a police officer's discretion to impound a car is sufficiently cabined

by the requirement that the decision to impound be based, at least in part, on a reasonable

community caretaking concern and not exclusively on 'the suspicion of criminal activity.'"

United States v. Coccia, 446 F.3d 233, 240 (1st Cir. 2006) (quoting Bertine, 479 U.S. at 375).

Defendant Lafferty argues that so long as they conduct an inventory search according to a

standardized inventory policy, the search is valid and any "subjective intent of the officers is not

relevant." See Hawkins, 279 F.3d at 86 (citing Bertine, 479 U.S. at 373). But "an inventory

search" has not been "conducted" as such simply because it is so labeled after the fact.

Moreover, the validity of the search necessarily includes Bertine's limitation that the inventory

search be "administered in good faith." Bertine, 479 U.S. at 373; see also id. at 372 (noting that

in that case, as well as in prior Supreme Court decisions upholding inventory searches, "there

was no showing . . . that the police, who were following standardized procedures, acted in bad

faith or for the sole purposes of investigation."). And underlying the rules regarding inventory

searches is "the principle that an inventory search must not be a ruse for a general rummaging in

order to discover incriminating evidence. . . . [The] individual police officer must not be allowed

so much latitude that inventory searches are turned into 'a purposeful and general means of

discovering evidence of crime.'" Florida v. Wells, 495 U.S. 1, 4 (1990) (quoting Bertine, 479

U.S. at 376 (Blackmun, J., concurring)).

Pretext may thus eviscerate the exception. See United States v. Rodriguez-Morales, 929

F.2d 780, 787 (1st Cir. 1991) ("Here, the district court did not find that the impoundment was

pretextual . . . ."); United States v. Coccia, 446 F.3d 233, 240 (1st Cir. 2006) (". . . and there is no

claim that the decision [leading to impoundment] was pretextual . . . .").

Defendant Lafferty claims that the search was non-investigatory in nature. But his

original arrest report made no claim that an inventory search was conducted, and instead,

explicitly stated that the van was searched for the cocaine described by FA. His tow report

similarly states that the reason for the tow was Plaintiff Mosko's arrest. While the van may have

been independently subject to impoundment for regulatory non-compliance, a jury may

reasonably conclude that Defendant Lafferty did not impound it for this reason but because of

the drugs that were found, that he did not search the van as a good faith inventory search, and

that he instead searched the van to recover drugs based on FA's tip. Disputed facts thus preclude

summary judgment.[3]

---

[3] Defendant Lafferty asserts finally that the Massachusetts Tort Claims Act immunizes him from
state law tort claims. Neither Massachusetts law nor the doctrine of sovereign immunity affords
protection to state officials sued for intentional torts in their individual capacities. Mass. Gen.

2. *Qualified Immunity*

Defendant Lafferty seeks summary judgment on the further ground that he is protected by qualified immunity. "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1989). The doctrine has been described as the best balance of "the evils inevitable in any available alternative"—on one hand the evil of divesting victims of their remedies, and on the other subjecting public officials to meritless accusation. See Harlow v. Fitzgerald, 457 U.S. 800, 813-14 (1982).

The doctrine's inquiry has been variously described but at bottom consists of three usually sequential steps: "(i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." Cox v. Hainey, 391 F.3d 25, 29-30 (1st Cir. 2004).

The court's denial of summary judgment as to the predicate constitutional violation answers the first question.

As to the second and third questions, while there is little doubt as to the clarity of the constitutional rights to be free from unreasonable searches and seizures generally, the Supreme Court has cautioned the lower courts "not to define clearly established law at a high level of

Laws ch. 258, § 10(c); O'Malley v. Sheriff of Worcester Cty., 612 N.E.2d 641, 648 (Mass. 1993). Defendant Lafferty suggests, however, that this court may re-construe Plaintiffs' allegations against him individually as though they are actually alleged against his official status, and then dismiss these re-construed allegations for failure to adhere to the strictures of Mass. Gen. Laws ch. 258, § 1 et seq. Defendant Lafferty's sole citation in support of this argument, Schenker v. Binns, 466 N.E.2d 131, 132-33 (Mass. App. Ct. 1984), does not compel or even suggest that argument's conclusion, and the court finds no basis to proceed as suggested.

generality." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011) ("The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.")). Recognizing that "it is sometimes difficult for an officer to determine how the relevant legal doctrine [. . .] will apply to the factual situation the officer confronts," the Court directs inquiry into "whether the violative nature of *particular* conduct is clearly established." Id. (quoting al-Kidd, 563 U.S. at 742). Thus any formulation of the "clearly established right" must be tailored to the precise context presented by the facts of the case.[4]

Upon such tailoring, the third relevant question becomes whether "it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Mullenix, 136 S. Ct. at 308 (quoting Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)). In other words, it must be "beyond debate" that the particular conduct would transgress the Constitution. Mullenix, 136 S. Ct at 312.

Thus, if a jury could find that the Defendant Lafferty violated the Plaintiffs' constitutional rights—those rights having been specifically defined and "beyond debate"—and that no reasonable officer could have believed otherwise, qualified immunity cannot terminate this case.

---

[4] The First Circuit has guided this inquiry as follows: "It is certainly true that the manner in which a right is defined can make or break a qualified immunity defense. Courts must be careful not to permit an artful pleader to convert the doctrine of qualified immunity into a hollow safeguard simply by alleging a violation of an exceedingly nebulous right. Courts must be equally careful, however, not to permit a defendant to hijack the plaintiff's complaint and recharacterize its allegations so as to minimize his or her liability." Limone, 372 F.3d at 46 (citations omitted).

Here, the court's conclusion regarding the jury's ability to reasonably infer that Defendant Lafferty disregarded a known risk of evidence fabrication—and arrested Plaintiffs regardless of that risk—suffices to disallow summary judgment on qualified immunity grounds. See Bazinet v. Thorpe, 190 F. Supp. 3d 229, 238 (D. Mass. 2016) (disputed facts as to officers' fabrication of evidence defeated summary judgment on qualified immunity grounds); Williams v. City of Boston, 771 F. Supp. 2d 190, 206 (D. Mass. 2011) (plaintiff "alleged sufficient facts to state a claim" for "malicious prosecution based on a violation of his Fourth Amendment rights, and for deprivation of his right to due process based on the fabrication of evidence. Thus, the defendants have not shown that they are protected from liability under the doctrine of qualified immunity.").

3.   *Plaintiff Mosko's Claims Against Defendant Golner*

Plaintiff Mosko brings the sole claim against Defendant Golner based on the allegedly unreasonable search of the van. Defendant Golner argues that the record is insufficient to survive summary judgment as to either a predicate constitutional violation or Defendant Golner's qualified immunity. See Golner Memo. Supp. Mot. Summ. J. 3, 9, Mosko v. Lafferty et al., C.A. No. 15-12159 [#54]. For the following reasons, the court agrees as to qualified immunity.

In contrast to the evidence as to Defendant Lafferty, the record includes little to show that Defendant Golner willfully turned a blind eye to FA's potential fabrications or had direct knowledge of Defendant Lafferty's unjustified reliance on FA's tips.

Further, the record is undisputed that the van was subject to towing under standardized policy, and Plaintiff does not proffer facts contradicting Defendant Golner's own testimony as to possessing not only an investigatory motive for the search, *but also* (unlike in Defendant Lafferty's case) a simultaneous belief as to its *justification*. On those facts, the court does not

find a clearly established constitutional right preventing Defendant Golner's approval of an inventory search. And thus, while Plaintiff Mosko may be able to show facts upon which it is "beyond debate" that every reasonable officer in Defendant Lafferty's position would know his search was unconstitutional, the same is not true as to Defendant Golner's approval of a search. See Mullenix, 136 S. Ct. at 312. Qualified immunity therefore shields Defendant Golner from trial.

### 4. *Municipal Liability*

Plaintiffs bring an action against the City of Lowell with claims that the City itself caused their alleged constitutional injuries. The court reaches this question regardless of the officers' qualified immunity. Askins v. Doe No. 1, 727 F.3d 248, 254 (2nd Cir. 2013) (citing Owen v. City of Independence, 445 U.S. 622, 657 (1980)).

The Supreme Court's decision in Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 690 (1978) divested municipalities of previously-enjoyed absolute immunity, holding instead that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury [. . .] the government as an entity is responsible under § 1983." Id. at 694. To prove such a case, a plaintiff must demonstrate both "that the municipal action was taken with the requisite degree of culpability," (*i.e.*, that the city acted deliberately) and a "direct causal link between the municipal action and the deprivation of federal rights." Bd. of Cty. Com'rs of Bryan Cty. v. Brown, 520 U.S. 397, 405 (1997). In other words, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials . . . ." Connick v. Thompson, 563 U.S. 51, 60 (2011) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986)).

Proving these elements of culpability and causation illuminates a distinction between municipal "policies" and "customs." Bryan Cty., 520 U.S. at 403-04; Monell, 436 U.S. at 691 (alluding to distinction between "official" customs and those "so permanent and well settled as to constitute a 'custom or usage' with the force of law.") (quoting Adickes v. S.H. Kress. & Co., 398 U.S. 144, 167-68 (1970)).

Unconstitutional actions executed pursuant to official *policy* present "straightforward" analyses of "fault and causation." Bryan Cty., 520 U.S. at 404. "Custom" cases, however, saddle plaintiffs with the additional task of first identifying a "relevant practice" that is "so widespread as to have the force of law." Id. In other words, plaintiffs in such cases must first identify a custom "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice," and *then* prove that custom was both deliberately adopted with sufficient culpability *and* "the cause of and the moving force behind the deprivation of constitutional rights." See Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989).

If the identified "custom" is facially unconstitutional, issues of causation and fault again become relatively straightforward. Cf. Bryan Cty., 520 U.S. at 405 ("[T]he conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains."). Thus in Bordanaro, where evidence demonstrated the Police Department "had a longstanding, wide-spread, and facially unconstitutional practice of breaking down doors without a warrant when arresting a felon" of which the Chief of Police was constructively aware, the First Circuit found it "almost inevitable" that constitutional injuries would occur and saw no difficulty in determining causation. See 871 F.2d at 1156, 1158.

Where, however, the identified "custom" is facially lawful, the question of "culpability" blurs. Specifically, "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action," which in the case being discussed was "an allegedly inadequate training *program*," the plaintiff must "demonstrate that the municipal action was not simply negligent, but was taken with 'deliberate indifference' as to its known or obvious consequences." Bryan Cty., 520 U.S. at 398, 407 (further describing "deliberate indifference" as "a stringent standard of fault, requiring proof that a municipal actor disregarded a *known or obvious consequence of his action*.") (emphasis added).

The court thus distinguishes between "known" and "obvious" consequences to which the city must be deliberately indifferent. With regard to "known consequences," at least in the failure-to-train context (and only in the failure-to-train context, plaintiffs argue), a "pattern of similar constitutional violations" as the ones alleged is "'ordinarily necessary' to establish deliberate indifference." Connick, 563 U.S. at 62. Further, outside the failure-to-train context, the First Circuit implied that a series of unconstitutional acts known to the city evidenced not only a "custom" attributable to the city but also deliberate indifference of the city. See Bordanaro, 871 F.2d at 1157.

With regard to "obvious" consequences, and again in the failure-to-train context (and again, only in the failure-to-train context, plaintiffs argue), "[t]he court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." Connick, 563 U.S. at 64. It appears the Supreme Court had already adopted a similar standard in the failure-to-screen context, having held that "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude

that the *plainly obvious consequence* of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" <u>Bryan Cty.</u>, 520 U.S. at 411 (emphasis added); <u>see</u> <u>Porto v. Town of Tewksbury</u>, 488 F.3d 67, 73 (1st Cir. 2007) (citing two prior First Circuit "excessive force" cases holding that § 1983 plaintiffs must demonstrate that said force was the "plainly obvious consequence" of hiring the officer, or a "highly predictable consequence" of the municipality's failure to train the officer).

In sum: if a reasonable jury could conclude that the City of Lowell (through its Superintendent of Police) adopted a custom with deliberate indifference to known or obvious consequences, and through that action caused the constitutional injuries alleged, summary judgment cannot enter.

The record allows Plaintiffs the opportunity to try to meet this burden at trial. The 1989 Informant Policy may demonstrate the municipality's knowledge of the need for safeguards to protect against the risks inherent in using confidential informants, and the municipality's systematic failure to enforce that policy—which, given that failure's ubiquity, may amount to the actual "custom" to be analyzed—may demonstrate deliberate indifference to the very risks that policy was intended to mitigate. <u>Cf.</u> <u>Glisson v. Ind. Dep't of Corr.</u>, 849 F.3d 372, 380 (7th Cir. 2017) (en banc) ("The existence of [official guidelines] . . . is evidence that could persuade a trier of fact that [the defendant] consciously chose the approach that it took."). Superintendent Lavallee—the relevant municipal actor—was potentially aware of officer complaints about the inaccessibility of written policies. In addition, the cavalier or simply non-existent enforcement of safeguards meant to protect against risks inherent to confidential informants, as described by Plaintiffs, may have been so extensive that a jury could conclude it occurred with Superintendent

26

Lavallee's blessing. A jury could further conclude that refusing to supervise the use of confidential informants—including by allowing confidential informants to be used without any documentation or meaningful check—obviously leads to and causes the malfeasance described here, including officers' blindness to the possible planting of evidence to secure easy arrests. Thus, action properly attributable to the city potentially caused Plaintiffs' constitutional injuries, precluding summary judgment on the Monell claims.

D.  Conclusion

For the foregoing reasons, the Motions—C.A. No. 13-12172 [#153, #157], C.A. No. 13-12302 [#68], and C.A. No. 15-12159 [#51, #57]—are DENIED. Defendant Golner's Motion for Summary Judgment, C.A. No. 15-12159 [#53], is ALLOWED.

IT IS SO ORDERED.

Date: March 31, 2017                                    /s/ Indira Talwani
                                                        United States District Judge